## HAWKINS vs. FILKINS.

The thirteen colonies, although dependencies of the British government, were entirely independent of each other; and separately and severally constituted the government of the United States; and it may be safely assumed that the people of the several states, in whom the sovereign power rests, had conferred upon their state governments sovereign and independent powers as such, limited only by the extent to which power was afterwards conferred by the constitution upon the federal government, or limited by it to the states,

But whether the constitution was made and adopted by the states, or by the people of the states, as a political question, is of no importance for any purpose of judicial investigation.

There can be no question but that the federal government derived its entire power and authority from the constitution; and is limited in the exercise of its powers to the specific grants of power therein contained, and to such implied powers as are necessary to give effect to the expressly delegated powers.

The powers granted to the federal government were for national purposes only: and the constitution and the laws made in pursuance thereof are the supreme law: and as the expressly delegated powers did not embrace any of the local municipal powers of the state government, they necessarily belong exclusively to the states and to the people; in respect to which the states are independent and sovereign; and to that extent the allegiance of the people is due to their state government.

The convention of this state, which framed the constitution of 1861, was called according to the provisions of the then existing constitution; and no acts of that

convention can be void except such as were contrary to the allegiance of the people to the federal government; viz: that which attempted to dissolve the connection of the state with the federal government, and those that were auxiliary to that purpose.

Admitting that the state had no power to withdraw from the compact she had entered into with the United States, and that the act by which she attempted to do this was void; that void act could not affect the validity of the constitution and government of the state in other respects: nor was it intended by that convention to destroy the state government, whose existence as such did not depend upon its connection with the United States.

The position of Arkansas in the national government was equal to that of any other state, her rights and responsibilities the same; and her people owed allegiance to the United States to the extent of the powers delegated for national purposes; but the moment the laws which protected the citizen, were suspended by force of the civil war, that allegiance ceased.

If the state of Arkansas was conquered territory, the laws and government in force at the time of the conquest, remained in force until altered by the conqueror.

If the government of Arkansas was entirely revolutionized, and all of its departments usurped by force, without law or protection, and consequently owing no allegiance to any power, the people of the state as of necessity had a right to establish *de facto* a government for themselves.

The late war between the United States government and that attempted to be established as the Confederate States was a civil war, and the rights of belligerents apply and govern the conduct and rights of both parties; but the rules of conquest over foreign territory do not apply to their full extent; nor were the civil governments of the states overturned by the result.

The only principle settled by the late civil war, is, that no state has the power to dissolve its connection with the federal government—the powers of the two governments, state and federal, remaining the same—the rights of the people the same.

The state courts derive no power or authority to adjudicate from the United States, but from the constitution and laws of the state government, whose power as to its municipal affairs is independent of any other government.

The state of Arkansas did not, either by the passage of the ordinance of secession, by which she unsuccessfully attempted to dissolve her connection with the United States government, or by any subsequent act of hers, suspend or destroy the existence of her state government.

The government of the state continued to exist *de jure*, from the time she attempted to secede, until suspended by the action of the convention of 1864; and the acts of the state government during that period, were valid and binding as though no attempt had been made to secede:

No state convention has the power to declare the existing constitution and government void *ab initio*; and thereby render invalid the executive, legislative and judicial acts.

The rule of construction, applicable as well to constitutions as acts of the legislature, is, that such construction, if possible, shall be given, that no clause, sentence or word shall be void, superfluous or insignificant; but if, from a view of the whole act, the intention is different from the literal import of its terms, then the intention shall prevail: construing the ordinance of the convention of 1864, by this rule, it is apparent that the intention was to make void the acts of the convention of 1861, only so far as the same were in conflict with the constitution and laws of the United States.

### *Error to Pulaski Circuit Court.*

Hon. LIBERTY BARTLETT, Circuit Judge.

ROSE, GALLAGHER & NEWTON, and GARLAND & NASH, for plaintiff.

We respectfully submit that the proposition, that the judgment upon which the execution was issued was rendered by a court whose acts were made void by the preamble to the present constitution of the State of Arkansas, is contrary to law.

The preamble to the constitution does not, *ex vi termini*, admit of such a construction; nor can the same be given to it by any fair intendment. See preamble to present constitution of Arkansas, *page 5 of pamph. Acts*, 1864.

The constitution is not to receive a strict construction. "The constitution should receive a fair and liberal construction." *State vs. Ashley*, 1 *Ark.*, 513; *State vs. Scott*, 4 *Eng.*, 270.

But there is a part of this clause which must be strictly construed. So far as it would take away vested rights, it is retroactive; and retroactive construction is not favored, and retrospective clauses must be strictly construed. *Baldwin vs. Cross*, 5 *Ark.*, 510; *Crittenden vs. Johnson*, 14 *id.*, 464; *Couch vs. McKee*, 1 *Eng.*, 484.

So far as it deprived individuals of their rights as a "legitimate consequence of the rebellion," this clause must be considered as penal. "Penal acts are to be strictly construed."

*Hughes vs. State*, 1 *Eng.* 131. Penal laws cannot be so construed as to embrace doubtful cases, and unless it were the clear intention to take away vested rights, then the clause must be held to be inoperative in that respect.

But, above all, let us apply the following rule: "A statute is to be construed, if possible, so that no clause, sentence or word shall be void, superfluous, or insignificant." *Wilson vs. Biscoe*, 6 *Eng.* 44; *Kelly vs. McGuire*, 15 *Ark.* 555. If the construction contended for by the appellee is to hold good, then the general saving of individual rights may as well be stricken out, since only the rights afterwards specially named are reserved.

For the "RIGHTS OF INDIVIDUALS" therein mentioned, should receive the most liberal construction, for the rule of law is, in the construction of statutes, in all things "*favorable*" the utmost latitude is to be given to the words, whilst in all things "*odious*" the words are to be restricted to their narrowest sense. *Smith's Commentaries, page* 649, *secs.* 496, 497, 498.

As to what is meant by "rights of individuals," we will simply refer to 1*st Black. Com., p.* 93; 1*st Stephen's Black. Com., pages* 128 *and* 153.

But if the convention did intend to effect the purpose, that it is contended the words used in the preamble import, the same is nugatory and without force for want of authority in the convention to effect the same.

We should bear in mind that this is a question between citizens of the state of Arkansas, simply, and in which no other power, state or individuals have any interest or concern; and that the proposition necessarily results, and which is the law of nations, that as to private rights and quoad its own citizens, when, by revolution or otherwise, a new government is for the time established, it does not need the recognition of other nations to validate it, but quoad its own citizens and internal affairs, it is not only a government *de facto* but *de jure*, for it exists, no matter what finally becomes of the government so temporarily established. *Wheaton's Int. Law* 56, (3*d Ed.*) and 310;

20

*Ib. Lawrence's Wheat.*, 36, 37 *and note* 15; *McIlvaine vs. Cox's Lessees*, 4 *Cranch*, 212; 1 *Burrill's Dic.*, *Word "de facto."*

Thus the legislature of the state of Arkansas, at the session of 1860 and '61, (*see Acts of* 1860, *p.* 214,) pursuant to the provisions of the constitution of the United States and the constitution of the state of Arkansas, called the convention of the people, which afterwards, on the 6th day of May, 1861, attempted to separate the state of Arkansas from the United States; this convention was duly elected by the people of the state of Arkansas, every county being represented, and organized the government, which, without any sensible or material opposition, governed the state of Arkansas until September, 1863, the capital of the state was occupied by the United States forces; and the present state government was adopted and organized, pursuant to the suggestions of the late president Lincoln, and put in force on the 18th day of April, A. D. 1864.

Thus it will be seen, that Arkansas, as far as she is concerned, *never was conquered by the people of Arkansas*, but by the United States, and therefore, the questions of what rights of person and property her citizens retained, as citizens of a conquered country, is not properly in issue; but even admitting, for the sake of argument, that Arkansas is a conquered country, then what is the *status* of her citizens, and what are their rights of person and property as citizens of a conquered country, under the "law of nations."

"When one country conquers or succeeds to another, all private contracts, &c., are left as they are found, as well as their laws, customs and usages, not inconsistent with the paramount right of the conquering power; this is to protect society itself." *Vide* 2 *Burlamaqui*, *p.* 2, 14—*clauses* 14 *and* 15; *Crabb's History of English Law*, 452; *Tucker's Black. Com.*, *chapter* 1, *page* 107; 1 *Sharshwood Black.*, 204; *Ware vs. Hilton*, 3 *Dallas*, 199; [1 *Con. Rep.*, 127] 1 *Bishop's Cr. Law*, *sec.* 7, *et seq. and notes.*

Particularly, *United States vs. Powers*, 11 *How.*, 570; *Mc-*

*Mullen vs. Hodge*, 5 *Texas*, 44; *Cass vs. Dillon*, 2 *Ohio*, 607; *Commonwealth vs. Chapman*, 13 *Metcalf*, 68-71; *State vs. Raywood*, 2 *Stewart*, 360; and *Bishop on Marriage and Divorce*, secs. 19, *et seq.*, and authorities cited; *Cross vs. Harrison*, 16 *How.*, 181; *Spence's Equitable Jurisprudence of the Court of Chancery*, vol. 1, *p.* 2, 3, 10, 105.

And in this construction of the law, the past history of civilized nations fully bears us out. In addition to what may be found in the foregoing references, we respectfully call attention to the following additional authorities: *Campbell's Lives of Chief Justices of England*, vol. 1, *p.* 80; [vitae *Roger Le Brabacon*,] Ib. vitae *Oliver St. John.*, 464-6-7-70, etc.; *Jefferson's Works*, vol. 7, *p.* 611-612; *Hamilton's Works*, vol. 7, pages 844-5; 8 *Wheaton*, 489; 2 *Gallison*, 501.

In another view, Arkansas is at least entitled to belligerent rights, always accorded by the laws of war of civilized nations, under the law of nations, to a conquered country, if she is so considered. *Hughes vs. Litsey et al., Amer. Law Reg., Jan. No.* 1866, *p.* 148; 2 *Blacks. U. S. Sup. Ct. Rep*, 635; *Lawrence Wheat.* 249, 250, *note; ib.* 605: *Hildreth vs. McIntyre*, 1 *J. J. Marsh.*, 205.

That the state of Arkansas *has never ceased to exist*, and that, as to *her own citizens* and *her internal affairs, she has always been sovereign and independent;* or, in other words, that the state of Arkansas *never did surrender her sovereignty as to these matters*, and that by her abortive attempt to secede from the United States, she did not forfeit any of these rights, or any other rights which she had not previously surrendered to the United States—*Martin vs. Hunter's Lessee*, 1 *Wheaton*, 304; [3d *Cond. Rep.*, 473;] *McCulloch vs. State of Maryland*, 4 *Wheaton*, 316; [4 *Cond.* 466.]

But finally, there is an insuperable objection to the construction sought to be put upon the preamble of the present constitution, by the attorney for the defendant in error, namely—that such a construction would be the violation of the constitution

of the United States; it would impair the obligations of contracts, and be in the nature of an *ex post facto* law; and the constitution of the United States is paramount, and her laws of superior force to the action of the state convention, as well as of legislatures.

We refer the court to the following authorities, as to laws impairing the obligation of contracts: 2 *Story on Const.*, *p.* 236, *sec.* 1385; *Blair vs. Williams*, 4 *Littell, Ky.*, 38—47; *Lapsley vs. Brashear*, *ib.* 56; *ib.* 75, 76; *Davis vs. Ballard*, 1 *J. J. Marshall*, (*Ky.*) 570; *Tounsend vs. Tounsend*, 1 *Peck. Tenn.*, 1; *Record Book K.*, *of Opinions Sup. Ct. Ark.*, *Burt vs. Williams —Opinion per Fairchild*, (*J.*) *p.* 506; *Smith's Com. on Constitutional Law*, *p.* 384, *sec.* 252.

*As to ex post facto* laws, *vide, Fletcher vs. Peck*, 6 *Cranch*, 87, (1 *Cond. Rep.* 308;) *Calder vs. Bull*, 3 *Dallas* 386; (1 *Cond. Rep.* 172.

And on both the latter points, see *Society vs. Wheeler*, 2 *Gallison* 105.


RICE, for the defendant.

There was no judgment rendered in any court of the United States as a foundation for the execution.

The court will take judicial notice of the fact that there was a revolution on the part of the people of the state against the government of the United States, that the courts held in Arkansas when this judgment was rendered, were rendered under confederate, and not federal authority; that every department of the state, executive, legislative and judicial claimed allegiance to the confederate government; that the revolution was unsuccessful; and that no civil government was established, that was recognized by any foreign power, or by the United States. The recognizing the "rebels" as belligerents by the United States was not recognizing them as a civil government. See *Secretary Seward's letter to Mr. Adams.*

It the confederate government was a civil government, it was

foreign to the United States; and the judgment being foreign, this court cannot examine and adjudicate upon the jurisdiction of the foreign tribunal that rendered it. See *Rose vs. Hinely*, 4 *Cranch*, 24.

Was this a court *de facto* or otherwise that rendered this judgment? To be a court of any jurisdiction it must have been a constitutional court. See 24 *Wendell*, 520,—*Chancellor Walworth's opinion, and authorities cited; Obarman vs. Booth*, 21 *Howard*, 515. The authority the court had was derived from the confederacy; and to give it legal power, the confederacy must have been a civil government *de facto*, or *de jure;* and the decision of this question belongs to the state department. *Hoyt vs. Ghelston*, 13 *John.*, 139; *Rose vs. Hinely*, 4 *Cranch*, 24; *Kennett vs. Chambers*, 14 *How.*, 38; *Luther vs. Borden*, 7 *How.*, 1.

There can be no *de facto* court. There may be a *de facto* judge of a constitutional court. 1 *J. J. Marsh.*, 205.

The court derived its authority from the confederacy, and that was not a *de facto* civil government with power to make a constitutional circuit, as has been decided by the political department of the government, and this court must follow that decision.

Belligerent rights do not constitute a civil government. *Lawrence Wheaton on Int. Law*, 40 *and a note*.

The constitutional convention which made the constitution under which this court is now acting expressly repudiate and declare null and void all legislative and judicial acts of the state of Arkansas, while acting under the ordinances of the convention of the 4th of March, 1861. The proviso cannot do away with the body of the act or section to which it is a proviso. The rule is thus stated. It is the general rule of law, which has always prevailed and become consecrated almost as a maxim in the interpretation of statutes, that when the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms. In short, a proviso covers special exceptions only out of

the enacting clause, and those who set up any such exception must establish it as being within the *words* as well as within the *reason* thereof.     *U. S. vs. Dickson*, 15 *Pet.*, 141.

But the clause or exception saving the rights of individuals is not repugnant to the body of the act or section.     The convention in the body of the preamble, declare that no individual could acquire any rights under the confederacy, and then saves all their rights derived from any other source.

The question is asked, cannot a state by virtue of its reserved power legally pass laws, create courts, etc., although it has violated its compact with the United States by seceding therefrom? Could Arkansas, after the 6th of May, 1861, exercise that kind of sovereignty and have a civil government which was legal and whose acts would be binding?

The question as to whether she could do so may be a judicial one; but the question as to whether she did exercise soverignty and establish a civil government, is a political one, as decided in the *Dorr and Borden cases*, and the decision of the political department is binding on the courts.

Mr. Chief Justice WALKER delivered the opinion of the court.

Jacob Hawkins, the plaintiff in error as well as in the court below, brought his action of debt, in the Pulaski circuit court, against Lemuel M. Filkins, upon a promissory note for the sum of four hundred and fifty dollars.     The declaration was filed, and the writ made returnable to the May term of said court, 1861. The writ was duly executed, and at the return term, the defendant appeared and craved oyer of the writing declared upon, which was granted by filing the original note.     Without further proceedings at that term, the case was continued until the September term, 1861, of said court.     At which term the parties appeared, and no further defence being offered, judgment was rendered in favor of the plaintiff for his debt, and costs of suit.

On the 24th day of July, 1865, execution was issued upon this judgment, by the clerk of the Pulaski circuit court, and there-

after, duly levied upon the property of the defendant, Filkins ; who, thereupon, gave notice to the plaintiff of his intended motion to stay and quash the execution so issued; the grounds of which were set forth in his petition substantially, as follows : " That there is, and was not, at the time said execution issued, any valid subsisting judgment on record in said clerk's office against the petitioner, (the defendant,) but was isued upon a record purporting to be a judgment rendered in the Pulaski circuit court, at its September term, A. D., 1861, at which time no legal court was held in said county of Pulaski, and that said judgment for that reason was void." This motion was resisted by the plaintiff, but after consideration, the judge of the circuit court granted an order staying all further proceedings on said execution, until the petition should be heard in the circuit court.

Afterwards, on the 7th day of November, 1865, the circuit court of Pulaski county, after having heard the evidence, and upon mature consideration, rendered judgment that the execution be quashed, set aside, and held for naught, and that the petitioner, Filkins, recover his costs, etc.

The judgment of the Pulaski circuit court, upon which the execution issued, and all the proceedings upon which it was founded, as well as the execution, and the endorsements thereon, were preserved by bill of exceptions, and made part of the record in the case.

With regard to the state of case thus presented, it may be well to remark, that the proceeding are all regular. No question is raised as to the validity of the judgment, or the right of the plaintiff to have satisfaction by execution, if, at the time when the judgment was rendered, there could be held a circuit court in Pulaski county; nor is there any question but that the court was held at the regularly appointed time and place, and by all the officers required by law to hold such court, who were all duly qualified to perform the duties imposed upon them by law, if, in law and in fact, there did, at that time exist a government and laws within the state of Arkansas. And as regards that question,

it is conceded that, unless by the action of her state convention, held on the 4th of March, 1861, the government of the state of Arkansas was destroyed, and ceased to exist, until it was subsequently revived under the present state constitution, the court that rendered the judgment in this case, was a legal court, and the judgment rendered by it valid. Nor is there any act of the convention, to which exception in this respect can be taken, unless it be that, by which a severance of the bonds of the national union was attempted. So that the question is, in fact, narrowed to this: Was the state government destroyed by force of such act? If such was not the effect of the ordinance of secession, it is not contended that the individual acts of her citizens, in organized hostile force against the national government, however it might fix upon them personal responsibility for attempting, by force, to prevent the government of the United States from exercising its constitutional powers and authority within the state, could affect the state government, or the right to make and enforce all needful laws for the municipal government of the citizens thereof.

Before however proceeding to consider the question, reduced, as we have seen it may be, to a single proposition, there are several preliminary questions, which it will become necessary to consider. Among which, are: the powers claimed and exercised by the states prior to the formation of the federal government—the object and purpose for which the federal government was established—the powers conferred upon it—the bonds of union between the states and the federal government, and their reciprocal obligations and duties to each other—and finally, the power of the state to dissolve its connection with the federal government, whether by ordinance or otherwise.

The mere statement of these very important and difficult questions, about which there has been such a diversity of opinion, at all times since the formation of the national government, and which resulted in a most disastrous civil war, shows the magnitude of the questions to be decided, and the difficulties which are to be

encountered in their determination. And not alone as questions of law are they important, for, involving as they do, the maintenance, or the overthrow of the legislative, the executive and the judicial acts under state authority, for nearly three years, upon the faith of the validity of which the contracts and dealings of the whole people of the state have been made, they become second only in importance to the correct decision of the law itself; and for these reasons, merit and must receive the most careful and deliberate consideration.

Guided, as we are assured we shall be, by well established historical facts, by the decisions of our own courts of the highest authority, and assisted, as we have already been, by the eminent counsel who have argued the case, with an earnestness and ability alike creditable to themselves and to the profession, and profitable to the court, we will proceed briefly to review some of the most prominent circumstances connected with the formation of the two governments, state and federal.

As political questions they will not be considered by us. But, as facts tending to show the nature and extent of the compact, which binds the state and the federal government together, and, particularly, to show how, to what extent, and under what circumstances, the state may sustain, and exercise its legitimate authority in the municipal administration of the state government, it becomes highly important to do so.

That the thirteen British colonies established in North America, (now states of the federal government,) although dependencies of the British government, were entirely independent of each other, is a historical fact, about which there can be no question. Nor, is it less certain that, subsequently, when the states confederated together, mainly for the purpose of defence against a common enemy, they did so as independent provinces or states. When passing upon the articles of confederation in convention, each state had one vote. Such, too, was the case in the congressional legislation, both before and after the articles of confederation were adopted. In *article*, 2 it was provided : " That each state

retains its sovereignty, freedom, independence, and rights, which are not in this confederation expressly delegated to the United States in congress assembled." *Elliott's Debates*, vol. 1, *p*. 107. The 3d *article* declared, that the states severally entered into a firm league of friendship with each other, for their common defence, the security of their liberties, and their mutual and general welfare.

At the close of the revolutionary war, in the treaty of peace with England, they are severally named as parties to that treaty, and severally recognized as independent states. Subsequently, when the inefficiency of the articles of confederation became apparent, the several states re-assembled in convention to amend them, so as to give greater strength and efficiency to the federal government, and to form a more perfect and enduring bond of union. The delegates in convention thus assembled, still voted by states, each state having one vote. By its own terms the constitution was not to take effect, unless adopted by nine of the states. And when adopted by the convention, it was by resolution submitted to a convention of delegates, to be chosen in each state by the people, under the recommendation of the several legislatures thereof, for their assent and ratification. *1st Elliott's Debates on Con.*, page 52; *Story on the Constitution*, vol. 1, page 188.

The constitution was laid before the congress of the United States, and by that body, by resolution, referred to the legislatures of the several states, to be by the legislatures submitted to a convention of delegates, chosen by the people of each of the states. *Story on Con.*, vol. 1, *p*. 189. And it was, subsequently, ratified by a convention of each of the states, separately, and by several of them not until late in the year 1789, after its submission.

The several states became parties to this compact by force of their voluntary assent and adoption, for it was never seriously doubted, but that if any one of them had declined to adopt the federal constitution, such state would not have been bound by it, even should all of the other states, with the assent of their whole

people, have done so; but would, in itself, have been a sovereign, independent goverment.

In view of these and other contemporaneous facts, we may safely assume, that the people of the several states, in whom the sovereign power rests, (according to the theory of our government) had conferred upon their state governments, sovereign and independent powers as such, which were plenary, for all the purposes of an independent government; and, which (as we shall presently see,) were only limited by the extent to which power was conferred, by the constitution, upon the federal government, or prohibited by it to the states.

The question as to whether the constitution was made and adopted by the states, or the people of the states, as a political question, was once esteemed by many as of vital importance; but, we apprehend, of less practical value now than was formerly supposed. But, however this may be as a political question, for all the purposes of judicial consideration, it is a matter of no importance, whether the constitution was made and adopted by the states, or by the people of the states, or by the people through the agency of states; because, whether it emanated from the one or the other, it is alike obligatory as the supreme law of the nation.

Our reference to the earlier history of the American government has been, not to ascertain political rights, but the more clearly to ascertain what the reserved rights of the states were. For it is expressly declared in the constitution that " the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

Our next inquiry, then, must be as to the extent of the powers delegated by the states, or the people thereof, to the " United States." For when we shall have done this, we can readily see what powers the state of Arkansas possessed on the 6th of May, 1861, when, it is assumed, that by an act of her state convention, she ceased to exist as a state; and to what extent, if at all, she

could sustain and administer her local state government. notwith-standing the act of seecssion.

There can be no question but that the federal government derived its entire power and authority from the constitution, and is limited, in the exercise of its powers, to the specified grants of power therein contained, and to such implied powers as are neces-sary to give effect to the expressly delegated powers. This is evident, as well from the express provision in the constitution, as from repeated decisions of the supreme court of the United States. *McCulloch vs. the State of Maryland*, 4 *Wheaton Rep.* 316; *Cadder and wife vs. Bull and wife*, 3 *Dallas Rep.*, 386; *Martin vs. Hunter's Lessee*, 1 *Wheaton Rep.*, 325. In the last mentioned case, Mr. Justice STORY said: " The government of the United States can claim no powers which are not granted to it by the constitution, and the powers must be such as are expressly given, or given by necessary implication."

It is equally clear, that these limited powers all relate, solely, to national purposes. This is plainly shown by the powers enu-merated: " to lay and collect taxes;" " to borrow money;" " to regulate commerce;" " to coin money;" " to establish post offices and post roads;" " to establish courts, inferior to the supreme court; " to declare war;" " to provide for, and maintain a navy;" are some of the most important powers delegated to the United States government; which, with all others, will be found to be strictly national. At the time the constitution was framed and adopted, there was a pressing necessity for conferring powers for national objects; but none, whatever, for conferring upon the national government, local municipal powers, because the state governments were already in existence, and were admitted to be fully competent to manage their internal affairs.

But limited and defined as these powers were, they were, by an express provision in the constitution, together with all the laws of the United States made in pursuance thereof, declared to be the supreme law of the land, and that the judges in every state shall be bound thereby, any thing in the laws or constitution of

any state to the contrary notwithstanding; and in the case of *McCulloch vs. The State of Maryland*, Chief Justice MARSHALL said: "That it was a proposition of universal consent, that the government of the United States, though limited in its powers, is supreme within its sphere of action, and being supreme, allegiance to it is due, both from the states, and the whole people, to the extent of its delegated powers."

We have seen that the powers not thus delegated, were expressly reserved to the states, and to the people thereof: and as the expressly delegated powers did not embrace any of the local municipal powers of the state government, they necessarily belong, exclusively, to the states, and to the people. In respect to all of which, the states have independent, sovereign power. The powers thus conferred by the states, as well as those retained, are said by Mr. Justice BALDWIN, who delivered the opinion of the court in the case of *The State of Rhode Island vs. The State of Massachusetts*, 12 *Peter's C. C. Rep.*, 719, to be of the highest sovereign capacity. In the exercise of this sovereign capacity, it is exclusive and supreme, within the limits of the state, over its municipal government. And allegiance is due from the people of the state, to their state government, to the full extent of its power and jurisdiction, and in this respect, there is no conflict between the allegiance due to the state, and to the federal government. Thus, there exist within the United States, two sovereign, independent powers, state and federal, but not over the same objects of government, because the one is strictly national, the other local. Each supreme and independent of the other, when acting within its legitimate sphere ot action; each deriving its power from one supreme source, dependent in many respects upon the other for support, and both taken together constitute one government. Thus considered as parts of one government, bound together, as we must admit them to be, by an indissoluble compact—to each having been assigned sovereign independent powers, to be performed for the common good of all—we are brought to consider the distinct proposition under consideration.

Did the passage of the ordinance of secession, and the revolutionary action of the state, destroy the state government, or make invalid the acts of her civil government?

No question can arise with regard to the position of Arkansas in the national government; her position was equal to that of any other state; her rights and responsibilities the same. Nor can any question arise with regard to the regularity, in all respects, of her call of the convention which passed the ordinance of secession. It was called under an act of the legislature, and approved by a direct vote of the people at the polls—a majority of those voting upon the question, being in favor of calling the convention. The objection to the validity of the proceeding, is not in this, but in the action of the convention, whereby an ordinance was passed, declaring the bonds of union dissolved, and renouncing all further allegiance to the United States government.

It is contended, that the state of Arkansas, by her convention, had no power to withdraw from the compact she had entered into with the United States, and that the act of secession, by which she attempted to do this, was void for want of such power. Suppose we concede this to be true, can it be said that a void act could affect the validity of the constitution and government of the state; or on the other hand, should it be said that the state had such power, the mere exercise of a lawful power would impair no other right. Therefore, in neither alternative could such effect be produced. There was no change made in the state government; the ordinance of secession neither added to, or detracted from the constitution. It was not intended by the convention to destroy the state government, whose existence as a state did not depend upon such connection. The constitution remained, substantially, the same (although re-affirmed,) as that under which the state government was originally organized. The same statute laws were continued in force, the same officers were continued in office, to administer the laws under the state government; no other state government, indeed no government whatever, contested with the state her right to administer the laws under such

government. An uninterrupted exercise of the powers of the state government, in all its departments, over the whole state, existed at the time the judgment, the validity of which is questioned, was rendered, and, although suspended after that, in portions of the state, on account of its military occupation by the United States troops, in other portions of the state, the administration of the state government was uninterrupted. Even in time of civil war, government and law remain absolute necessities. The people of the state had given their allegiance to the state government, and were entitled to its protection. Their only protection must necessarily come from the state government; because, for municipal government, the power existed no where else. The federal government could set up no such government, because no power to do so was delegated to it. Therefore, unless the state could govern, there could be no government, and as a necessary consequence, the whole people of the state would be left without law, without government; life, liberty and property left to the mercy of brutal violence, and the whole society, in this age of advanced civilization, be left to the mercy of those who can only be restrained from violence by law. Such is not, and from the very nature of things, cannot be the law—not even over conquered territory, unless our most eminent judges have been greatly mistaken. In the case of the *United States vs. Percheman,* 7 *Peters Rep. page* 86, Chief Justice MARSHALL said: " It may not be unworthy of remark, that it is very unusual, even in cases of conquest, for the conquerors to do more than to displace the sovereign, and assume dominion over the territory. The modern usages of nations, which have become law, would be violated; that sense of justice and of right, which is acknowledged, and felt by the whole civilized world, would be outraged, if private property should be generally confiscated, and private rights annulled. The people change their allegiance, their relation to their ancient sovereign is dissolved. But their relations to each other, and their rights of property remain undisturbed."

When delivering the opinion in the *Amy Warwick case,* Mr.

Justice GRIER said : " It is a proposition never doubted, that the belligerent party, who claims to be sovereign, may exercise both belligerent and sovereign rights,  *  *  *  *  Under the very peculiar constitution of this government, although the citizens owe supreme allegiance to the federal government, they owe, also, a qualified allegiance to the states in which they are domiciled." 2 *Black Rep., page* 673. This power, during a civil war, to exercise both belligerent and sovereign rights, so distinctly asserted by Vattel, and by the supreme court of the United States, through its eminent judges, MARSHALL and GRIER, is fully illustrated and most distinctly announced by Judge STORY, in the case of the *United States vs. Hayward*, 2 *Gallison Rep.*, 485. The facts in that case were, that *"Castine,"* a port of entry in the district of *Penobscot*, within, and belonging to the United States government, was, on the 1st of September, 1814, taken possession of by the British troops, and was held by that power until after the treaty of peace, After having thus taken possession, the governor of *Nova Scotia* issued a proclamation claiming the whole country. Under this state of the case, the question arose, as to whether *"Castine,"* during the time it was thus held, was to be considered a foreign port. In regard to which Judge STORY said : " by the conquest and occupation, the laws of the United States were necessarily suspended in *Castine*, and by their surrender, the inhabitants became subject to such laws, and to such only, as the conquerors chose to impose. No other laws could, in the nature of things, be obligatory upon them; for, where there is no protection, or sovereignty, there can be no claim to obedience." *Id. page* 502. " By the conquest and occupation of Castine, that territory passed under the allegiance and sovereignty of the enemy. The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced, or be obligatory upon the inhabitants, who remained and submitted to the conquerors. Castine, therefore, could not, strictly speaking, be deemed a part of the United States; for its sovereignty no longer extended over the place." *Id.* 501.

Thus it is shown, even admitting that Arkansas should be held as foreign territory—conquered if you please, by the Confederate States, (which was not in point of fact true,)—that, for the time being, no allegiance was due from the citizens of the state to the United States; because the sovereign power of the United States was suspended over the territory in the possession of the enemy, and was not obligatory upon the inhabitants who remained, because, says Judge Story, " where there is no protection or sovereignty, there can be no claim to obedience."

Such was the condition of the people of Arkansas. They owed to the United States allegiance, to the extent of her delegated powers for national purposes, but the moment the laws, which protected the citizen, were suspended by force of a civil war, that allegiance ceased.

During the suspension, there must, of necessity, be some law to govern the people. All associations of people, when numerous, must of necessity have government; self-protection, indeed their very existence depends upon it. A civilized christian people are not because of war, to be remitted back to a state of barbarism. Arkansas, with other states, attempted to organize a new government. At the time she attempted to do this she was a sovereign state, with all of her powers and rights as perfect and full as were the powers of the original thirteen states. Amongst the reserved rights of the states, and of the people, is that of making, altering or remodeling their state constitutions. That it is republican in form, and does not infringe any of the powers delegated to the United States, is all that can be required of them. Beyond this, there is no restriction upon them. Nor has it ever been questioned, that the states have an exclusive right to make all necessary laws for the government of the people of the states, and to execute them. They had a government and laws in force at the time that, by force of civil war, the laws of the United States were suspended; and, like the people of " Castine," they owed obedience to the laws and government under which they lived, although that government should be held by force of arms.

21

It would be strange, indeed, if more than ten millions of people, over whom the national sovereignty had been suspended, and, consequently, no claim of obedience to any sovereign, superior power existed, could not, in any event, establish and maintain a valid *de facto* government. The mere statement of the proposition furnishes to it an answer; because if there is no ruling authority over them—no obligations of duty—then, surely, they are free, under the laws of nature and of God, to make laws for their own government, and to enforce obedience to them, over all persons within their territorial limits.

Thus, in the case of *Hilldreth's heirs vs. McEntire's Devisee*, 1 *J. J. Marshall, page* 208, it was held that "when government is entirely revolutionized, and all its departments usurped by force, or the voice of a majority, then prudence recommends, and necessity enforces obedience to the authority of those who may act as public functionaries, and in such a case, the acts of a *de facto* executive, a *de facto* judiciary, and of a *de facto* legislature, must be recognized as valid. There is no government in action, excepting the government *de facto*, because all the attributes of sovereignty, have, by usurpation, been transferred from those who had been legally invested with them to others, who sustained by a power above the forms of law, claim to act, and do act in their stead."

In the case of *Hughes vs. Lilsey et al.*, recently decided in Kentucky, as reported in *American Law Register, Jan. no.* 1866, it is said: "The defendant, before the war, was a citizen of the state of Texas, and owed to that state a true and faithful allegiance. *   *   * Allegiance and protection are correlative duties, 4 *Wheaton Reps.* 254; 2 *Gallison Rep.* 500; *Lawrence's Wheat.* 600. And where the federal government, as is averred in this case, did not, and could not protect the defendant, *   * it surely would be unjust to exact from him the full and complete discharge of his duties to the federal government, and deny to him, especially in a state court, a defence based upon those rights,

which the laws of nations and of war confer upon the people of a *de facto* state, in revolt against the established government."

There arose a question of much importance in Texas, after the people of that state had overthrown the Mexican authority, and established for themselves a new government, as to whether the Mexican laws remained in force, and communicated title to property under the new government. Mr. Justice LIPSCOMB, who delivered the opinion of the court, after a review of authorities, concludes that no treaty stipulations are necessary to protect the rights of property, upon a change of government, and proceeds: " It would be difficult to conceive, on any known principles of reason, or just regard to the rights of man, why a change made by the people themselves, should subject their rights to harsher rules of construction. It is indeed a principle, that seems to pervade the whole social relations of man, that laws, customs, and usages, when once established, shall continue until abrogated by the introduction of new ones; our sympathies to such influences, and reason, approve them just and right; and in truth, it is hardly possible to conceive of a civilized people existing, where all laws and customs, and all the social relations have been dissolved," *McMullen vs. Hodge*, 5 *Texas Rep.* 72.

In the case of the *United States vs. Mitchell*, 19 *Peters R.* 734, it is held that : " The inhabitants, citizens, or subjects of a conquered, or ceded country, retain all the rights of property, which have not been taken from them by the orders of the conqueror, or the laws of the sovereign, who acquired it by cession, and remain under their former laws until they shall be changed."

In the case of *United States vs. Perkins*, Mr. Justice CATRON, who delivered the opinion of the court, said: " By the law of nations, in all cases of conquest among civilized countries having established laws of property, the rule is, that laws, usages and municipal regulations in force at the time of the conquest, remain in force until changed by the new sovereign," 2 *Howard U. S. Rep.* 577.

These authorities, as well as others to which we have had reference, very clearly establish two propositions:

1. That if Arkansas was conquered territory, the laws and government in force at the time of the conquest, remained in force until altered by the conqueror. ·

2. That if the government of Arkansas was entirely revolutionized, and all of its departments usurped by force, without law or protection, and, consequently, owing no allegiance to any power, the people of the state, as of necessity, had a right to establish, *de facto*, a government for themselves.

And thus, we are brought to consider the character and object of the war.

The positions assumed by the defendant's counsel, are based upon the assumption, that the State of Arkansas, at the time the judgment was rendered, was acting with, and part of a foreign government—of this, we will presently consider.

That the late war between the United States government, and that attempted to be established as the Confederate States government, was a *civil war*, we entertain no doubt. It was, in view of the distinct and well defined limits of the territory, over which there was, at the time, assumed to be a distinct and separate government; of the large and well appointed armies, and well contested conflicts in arms, beyond all question such. It was recognized as a *civil war*, by foreign nations; so treated by the substantive acts of the United States; so held by writers on international law, and so expressly decided by the supreme court of the United States. *Vattel's Law of Nations, page* 424; 2 *Blackstone's Com.. page* 669; *Lawrence's Wheaton's International Law, page* 612; *Santissima Trinidad, 7 Wheaton's Rep.*, 337; *Proclamation of Queen Victoria, 13th May,* 1861; *Proclamation of President Lincoln, 16th August,* 1861; *The Army Warwick prize case,* 2 *Black, United States Sup. Court Reports, page* 635.

"When a party is formed in a state, who no longer obey the sovereign, and are possessed of sufficient strength to oppose him— or when, in a republic, the nation is divided into two opposite

factions, and both sides take up arms—this is called a civil war."
*Vattel*, 424. " And though one of the parties may have been to
blame in. breaking the unity of the state, and resisting lawful
authority, they are not the less divided in fact." *Id.* 425.

" Where the party in rebellion occupy and hold, in a hostile
manner, a certain portion of territory; have declared their inde-
pendence; have cast off their allegiance; have organized armies;
have engaged in hostilities against their former sovereign, the
world acknowledges them as belligerents, and the contest a war."
2 *Black Sup. Court Rep.*, 666. "When the regular course of jus-
tice is interrupted by revolt, rebellion, or insurrection, so that the
courts of justice cannot be kept open, *civil war exists*, and hostili-
ties may be prosecuted on the same footing as if those opposing
the government were foreign enemies invading the land," *id.* 667.
"It is not the less a civil war with belligerent parties in hostile
array, because it may be called an ' insurrection' by one side, and
the insurgents be considered as rebels, or traitors. It is not
necessary that the independence of the revolted province, or state
be acknowledged, in order to constitute it a party belligerent in a
war, according to the law of nations," *id.* 669. " Under the
very peculiar constitution of this government, although the citi-
zens owe supreme allegiance to the federal government, they owe
also, a qualified allegiance to the state in which they are domiciled.
\* \* \* Hence, in organizing this rebellion, they have *acted
as states*, claiming to be sovereign over all persons within their
respective limits, and asserting a right to absolve their citizens
from their allegiance to the federal government." *Id. page* 673.

The late war with the United States, then, being a civil war,
all of the rights of the citizens within the territory where it exis-
ted, may well be claimed. But the fact that it is a civil war
does not, necessarily, give to the victors all of the rights of con-
quest as between foreign nations. In a domestic war between
different portions of the same government, so far as regards the
suppression of armed resistance, it may be complete, but the
rules of conquest over foreign territory do not apply to their full

extent; no government can, properly speaking, conquer its own territory. And, more particularly, may it not be done in a complicated government like ours. The idea of either conquest or coercion, is not to be tolerated from any thing in the history or structure of our government, unless it be that coercion which is necessary to suppress insurrection and rebellion. The public mind has been for a time unsettled upon this question, and, even at this time, it would seem that there exists, in some minds, an impression that, by the exercise of military force, the whole civil governments of the states have been overturned by revolution; in consequence of which, new powers have sprung into existence. However much this may be indulged in, by wild theorists in politics, it can never be sanctioned by the judiciary.

We will best understand the extent of this error by keeping constantly in mind the fact, that in the civil war just closed, there was but one great political question at issue, which was as to the power of a state to dissolve its connection with the national government—in which, by a conflict in arms, it has been settled that such power does not exist. That is the question, and the only question settled. In all other respects the compact remains just as it was previous to the war, and this change is but a change in the construction of the compact. The powers of the two governments, state and federal, remain the same—the rights of the people the same. The question thus settled, not only denies that the states have power to secede, but upon principle, must also deny to the states the right to destroy or suspend their state governments, by any means whatever; for it cannot be denied that upon the existence of the state governments depends that of the federal government under its present constitution. A consolidated national government may be established upon the ruins of the state governments, but there will cease to be any longer, a government under the present constitution. Nor can we conceive how it would be possible for the federal government to destroy a state government. Because, as has at all times been held, that government is of limited delegated powers, and the constitution

must, as held by Mr. Justice DAVIS, in the case of *Millegan ex parte*, whether in peace or war, limit and control the action of the government—in his own language : " The constitution of the United States is a law for rulers and people, equally in war and in peace." The national government, then, must exist, and that too, under the provisions of the constitution, in war as well as in peace; and if it must exist, it cannot destroy the state governments, which are indispensably essential to its existence. Nor can a state government be altered, or changed by the federal government; nor can it rightfully compel the people of a state to make any change in their local government, because, by such compulsion, the act, in effect, would be the act of the federal government, not of the state.

At this point we are brought to consider another question, which is involved in the range of the argument by the counsel for the defendant, in which he assimilates the condition of the state, to that of a conquered territory of a foreign government. We have seen that the national government was formed by the states, and the people, and is of defined limited powers, under which it must act in time of war, as well as in peace. The power of conquest is no where delegated, and therefore cannot be rightfully exercised. But if such power had been given, it certainly never could be, that the United States could conquer her own territory; because all the while that territory was hers. She could gain no new title by conquest. To suppress insurrections, to repel invasions, and to execute the laws were the only domestic purposes for which she could call into service military force. Such were certainly the views entertained by both presidents, BUCHANAN and LINCOLN. To Mr. Buchanan the question was presented : " Has the constitution delegated to congress the power to coerce a state into submission. * * If answered in the affirmative, it must be on the principle that the power has been conferred upon congress to declare and make war against a state. After much serious reflection I have arrived at the conclusion that no such power was delegated to congress, or to any

other department of the federal government." *Congressional Globe*, 1860—1; *Appendix, p. 3.*

President Lincoln, in his inaugural address, 4th March, 1861, says "perpetuity is implied in the fundamental law of all national governments. * * It follows from these views, that no state upon its own mere motion, can lawfully get out of the union; that *resolves* and *ordinances* to that effect are legally void. * * I therefore consider that, in view of the constitution and the laws, the union is unbroken. * * Where hostility to the United States in any interior locality, shall be so great and so universal as to prevent competent resident citizens from holding the federal offices, there will be no attempt to force obnoxious strangers among the people for that object." *Congressional Globe*, 1860-1, *page* 1434.

These opinions of the two chief magistrates of the nation at the commencement of the war, show, most clearly, what was, then, understood to be the limit of constitutional power, and the purpose alone for which force might be used. We know that, as the civil war enlarged in proportions, an increased force was used by the national government, and under the plea of national necessity upon a great emergency, powers not provided for under the constitution, were exercised, in which the views of counsel may have taken root, but we must believe that however cultivated and to whatever dimensions they have recently grown, they are a growth, the seeds of which were never scattered by the great arm of the patriot founder of the national government.

The conclusions at which we have already arrived, will, to a great extent, furnish an answer to the able and ingenious argument of the counsel for the defendant, who bases his argument upon two propositions:

1. That the state, whether she rightfully, or not, connected herself with the Confederate States, constituted part of the Confederate States government, which he assumed was a foreign government, contesting in arms her right to take a place among the independent nations.

2. That all of the authority, which the court that rendered the judgment had, was derived from the Confederate government.

And assuming these propositions as true, he argues that, inasmuch as the Confederate States failed to sustain her position by force of arms, and was never recognized as an independent government, this court cannot decide upon the question, but must be governed by the action of the national government. And to sustain this latter position, he has referred to several authorities of deserved weight, which very fully sustain his position as between this government and foreign governments; but after due consideration, we are satisfied that the question, as to whether the late Confederate States government was, or was not a foreign government, is not properly before us. We are aware that cases may, and probably will soon arise, where this will properly come before us for consideration; until which time, we will enter into no consideration of it.

The question before us is, not with regard to the relations existing between the Confederate States and the United States, but whether the state of Arkansas, after the ordinance of secession, maintained her state government, either *de jure or de facto*. The learned counsel, in our opinion, was mistaken in supposing the courts of Arkansas derived any power, or authority to adjudicate, from the Confederate States government, or from the United States government. The power of the court was derived, directly, from the constitution and laws of the state government of Arkansas, whose power as to its municipal government, as we have seen, is independent of any other government, whether confederate or federal. The fact that she chose, in her sovereign capacity, to act with the Confederate States, (even conceding that she had the power to disconnect herself from the United States government, which we have seen she had not), in no wise affected her rights, or power as a state. And so far as the recognition of the state government is concerned, we are sustained by very high authority in saying, that no recognition was necessary; and we may further safely assume that, if it was, there is

abundant evidence that the existence of the state government of Arkansas, was fully and explicitly acknowledged by the executive department of the nation, in the president's proclamation of the 22d September, 1862, in which he expressly declares: "that the war has been and will still continue to be prosecuted to restore the relations between the United States and each of the states and the people thereof, in which the relation is, or may be suspended or disturbed;" as well as by the legislative department, in the act of congress of the United States, approved 4th March, 1862, apportioning to Arkansas her full representation.

We have reserved a reference to the following authority, as more appropriately connected with this precise question, and upon a careful consideration of it, we think it will be found highly applicable to, and in a great measure decisive of, the question under consideration. We prefer, therefore, to refer to it by giving the language of the learned writer on international law, Mr. WHEATON, who, at page 56, says: "Sovereignty is acquired by a state, either at the origin of the civil society of which it is composed, or when it separates itself from the community of which it previously formed a part, and on which it was dependent. This principle applies as well to internal as to external sovereignty. But an important distinction is to be noticed, in this respect, between these two species of sovereignty. The internal sovereignty of a state, does not in any degree depend upon its recognition by other states. * * The existence of the state *de facto*, is sufficient in this respect, to establish its sovereignty *de jure*. It is a state because it exists." *At page* 57, the same writer says: "The identity of a state consists in its having the same origin or commencement of existence; and its difference from all other states consists in its having a different origin or commencement of existence. * * This existence continues until it is interrupted by some change affecting the being of the state. If this change be an internal revolution, merely altering the municipal constitution, and form of govern-

ment, the state remains the same; it neither loses any of its rights, nor is discharged from any of its obligations."

It is apparent from this authority, that the internal sovereignty of Arkansas did not depend upon the recognition of the United States government; and if it did, it is equally clear that Mr. Lincoln, in his inaugural address, as well as in his subsequent proclamations, did recognize the existence of the state governments after they had passed ordinances of secession. After the ordinances of secession of several of the states had been passed, and after the formation of the Confederate States government, that government sent commissioners to Washington, whom Mr. Seward refused to receive, because, by the principles announced in the president's inaugural address, he was precluded from admitting, "that the states have, *in law, or in fact,* withdrawn from the federal union." *Department files, March 15th,* 1861. *See acts of congress* 1862, *apportioning representation to Arkansas.*

We have looked carefully into the case of *Luther vs. Borden,* particularly relied upon by counsel in argument, and although the question in that case was with regard to the acknowledgment of a state government, and in that respect differs from the other cases cited, yet, we do not think it applicable to the state of facts in this case. In that case, two state governments were set up in *Rhode Island,* each claiming to be the true government. The court when called upon to decide between them, held that it was a political question, which should properly be settled by the executive department, or by the congress of the United States, and that the court was bound by such recognition; that the *charter government of Rhode Island* having been recognized by the national government, the court, without further inquiry, would hold that to be the true government. But in the case before us, no such question is presented; there existed but one government in Arkansas at the time the judgment was rendered; that government, like the *"charter government,"* was the original government—a government which continuously existed; and

which, as we have seen, was recognized by the federal government as existing, and which continued to exist, until the government under the new constitution assumed its administration, or took effect.

After the most mature consideration of the whole case, involving many new and difficult questions, which have arisen under circumstances growing out of the late action of the state, we feel fully sustained, by the weight of authority, and upon principle, as well as by the express decisions of the court of appeals of the state of Kentucky, in the case of *Norris vs. Doniphan*, reported *in* 4 *Metcalf, page* 385, and of the supreme court of the state of Mississippi, in *Hill et al. vs. Boylan et al.*, decided at the October term, 1866, in announcing the following, as the conclusions at which we have arrived.

1. That the state of Arkansas did not, either by the passage of the ordinance of secession, by which she unsuccessfully attempted to dissolve her connection with the United States government, or by any subsequent act of hers, suspend or destroy the existence of her state government.

2. That the government of the state continued to exist *de jure*, from the time she attempted to secede, until suspended by the state government under the new constitution, and that the acts of the state government, during that period, were valid and binding as though no attempt to secede had been made. And, consequently, the judgment rendered in the case before us was valid, unless by the subsequent action of the convention that framed the constitution of 1864, it was invalidated and rendered void.

Upon examination of that part of the acts of the convention, which, it is assumed, invalidate and declare void the acts of the government of the state of Arkansas, under the constitution adopted by the convention assembled on the 4th of March, 1861, it is difficult to determine, whether it was intended as a preamble to the constitution, or as an independent ordinance. Perhaps, in view of its position, its recital of facts, and its emphatic declara-

tions, so confusedly intermingled, it may, to some extent, be said to partake of both.

In position, it precedes the constitution, and is as follows :

"We, the people of the state of Arkansas, having the right to establish for ourselves a constitution in conformity with the constitution of the United States of America, recognizing the legitimate consequences of the existing rebellion, do hereby declare the entire action of the convention of the state of Arkansas, which assembled in the city of Little Rock, on 4th of March, 1861, was, and is, null and void ; and is not now, and never has been binding and obligatory upon the people.

"That all the action of the state of Arkansas, under the authority of said convention, of its ordinances, or of its constitution, whether legislative, executive, judicial or military, (except as hereinafter provided) was, and is hereby declared null and void ; *Provided*, that this ordinance shall not be so construed, as to affect the rights of individuals, or to change county boundaries, or county seats, or to make invalid the acts of justices of the peace, or other officers in their authority to administer oaths, or to take and certify acknowledgments of writings, or in the solemnization of marriages ; *And, provided further*, that no debt or liability of the state of Arkansas incurred by the action of said ,convention, or the legislature, or any department of the government, under the authority of either, shall ever be recognized as obligatory."

It is contended by the counsel for the defendant, that if the constitution framed by the convention of 1861, and the government and laws thereunder, should be held to have been originally valid, still, the convention, which subsequently, in 1864, convened, had the power to declare the constitution of 1861, and the acts of the government under its authority, null and void ; and in fact had done so. On the other hand, the counsel for the plaintiff contends, that upon a fair and just construction of the ordinance of 1864, such was not the intention of the convention ;

but, that if such was its intention, it had no power to do so.

Thus the questions are presented:

1. Had the convention of 1864, power to declare the constitution and government formed by the convention of 1861, void, *ab initio?*

2. If it had such power, was it exercised or attempted to be exercised, in the ordinance under consideration?

If the ordinance is consistent in its provisions, and unambiguous in its language, the intention of the convention is to be ascertained, and carried into effect, according to the ordinary meaning of the language used. But if the ordinance, upon examination of its several parts, should be found inconsistent or ambiguous, we must bring to our aid several well established rules for construing contracts and laws of this character, and to which we may presently refer.

The ordinance, at the outset, affirms the right of the people to establish a constitution, "in *conformity with the constitution of the United States*," and "recognizing the legitimate consequences of the existing rebellion," declares the *entire action of the convention* of the 4th March, 1861, null and void, and never, at any time, binding upon the people. Now, it is evident, that if the word *entire*, in this connection, be taken in its enlarged sense, it comprehends everything done by the convention of 1861; that is, that the convention of 1861, had no power to do any thing. And if this be true, it must be because the convention had no legal existence—which we have already determined not to be the case. The convention of 1861 was a legally constituted convention of the people, with power to do all that a convention might lawfully do. Acts done in excess of power, do not vitiate, or make void those done within the scope of the powers conferred.

At this point, then, arises a question as important as it is new. That is, has one convention the power to declare *void ab initio,* the constitution of the state framed by a preceding convention? If this be true, and such be its effect, it necessarily follows, as a consequence, that, from the 6th of May, 1861, until the govern-

ment under the present constitution took effect, there was no government whatever in the state of Arkansas; for no one will contend, that there can exist a government, without the adoption of some fundamental rules, by which the sovereignty is transferred from the individual members of society to a corporation of their own creation. Until this is done, there is no government —no sovereign power to govern conferred by the people, and, of course, it is retained by them individually.

If the convention of 1864 had power to do this, then, a state convention may destroy its state government. This we have already said the state cannot do, whether attempted by ordinance or otherwise. If the bond of union of the states is, as we have held, perpetual, in defiance of the powers of a state, or its efforts to sever them, it is bound to keep in existence a state government, republican in form, and by an indissoluble bond of union, in connection with the federal government. In no other condition can a state fulfill its covenant of duty with the federal government.

The most extreme doctrine of the right of secession, never went beyond this, or could effect more.

Upon principle, if the convention of 1864 had power to declare the constitution of 1861 void "ab initio," most clearly that of 1861 had a like power to declare the constitution and government of 1836 void. The people, from whom all power is derived, never delegated to any convention the power to destroy all government; nor, as we have seen, can any such power be exercised by the people of any state, without violating its compact with the federal government. Nor is this assumed power permissible for another reason. It is, also, in violation of that clause in the federal constitution, which denies to a state the right to pass laws ex post facto, or laws impairing the obligation of contracts. Fletcher vs. Pick, 6 Cranch Rep. 87; New Jersey vs. Wilson, 7 Cranch Rep. 164. "It is immaterial whether the contract be between a state and an individual, or between individuals only; the contracting parties, whoever they may be,

stand, in this respect, upon the same ground. The obligations imposed, and the rights acquired by virtue of the contract, cannot be impaired by legislative act." *Smith's Com. p.* 384. Nor are these restrictions upon the state to be evaded, or overridden by any claim of omnipotence by a convention; in this respect, like a state legislature, it is subordinate to the constitution of the United States.

This precise question recently came before the supreme court of the United States, in the case of *Cummings vs. The State of Missouri.* The state of Missouri had, by a constitutional provision, attempted to abridge the rights of a certain class of her citizens, among which were clergymen, whose right to preach the gospel of Christ was attempted to be fettered by an oath prescribed by the convention, penal and retrospective in its provisions. It was contended that the convention of the state of Missouri was of enlarged powers, in the exercise of which it might prescribe such terms upon the exercise of the rights and privileges of its own citizens, as it might deem best for the public good. Mr. Justice FIELD, who delivered the opinion of the court, in which it was held that the constitutional provision, which placed restrictions upon the rights of ministers and others, was in violation of the constitution of the United States, and, for that reason, inoperative and void, placed his opinion upon principles, which are, to some extent, applicable to this case. He says: "The theory upon which our political institutions rest, is, that all men have certain inalienable rights; that among these, are life, liberty, and the pursuit of happiness; all avocations of honor, all positions, are alike open to every one, and in the protection of these rights, all are equal before the law." And in addition to these, are, upon principle, those, also, of acquiring, possessing, and protecting property, which, by the express language of the declaration of rights in the constitution of Arkansas, are excepted out of the powers of the government, and are declared to be forever inviolate. Perhaps, in the whole history of man, no more sweeping attempt was ever made, to

destroy the rights of property, than the one under consideration, if the construction of the ordinance contended for by the counsel for the defendant should be adopted.

This late and important decision of the supreme court, then, is not only conclusive as to the limitation of the power of the state convention, by the constitution of the United States, but it also settles the question as to the extent of that limitation, in the preservation of the free exercise of pursuits most conducive to man's happiness, or support; and to protection in the use and enjoyment of the property acquired by him.

In view of all which, we are satisfied that the convention of 1864, (if, upon further inquiry, it should appear that it so intended,) had not the power to declare the constitution of 1861, and the acts of the state government under it, void.

1st. Because it would thereby, in effect, destroy all state government, which, we have seen, it could not do.

2d. Because it would destroy the right of property, which is, also, in violation of the constitution of the United States.

Thus, it will be seen, that unless the word, *"entire"* can, without destroying the sense of the ordinance, be limited in its meaning, it must, necessarily, lead to the conclusions at which we have just arrived. The rule of construction, as laid down by this court, in *Wilson vs. Biscoe*, 6 *Eng.*, *p.* 48, and which is alike applicable to constitutions, as well as acts of the legislature, is, that such construction (if possible) should be given to the act, that no clause, sentence, or word shall be void, superfluous or insignificant; but if, from a view of the whole act, the intention is different from the literal import of its terms, then, the intent should prevail. And in *Kelly's heirs vs. McGuire and wife*, 15 *Ark. Rep.*, 594, it is said: "It is the duty of the court, if possible, to ascertain the legislative will, and to execute it, because the intention constitutes the law; no construction is to be indulged, that could produce absurd consequences;" and in order to ascertain what the true intention of the framers of the act is, it is a rule, that if many different interpretations present

22

themselves, from the language in which the law is expressed, and any one of them will enable us to avoid such an effect, that should be preferred which appears to be the most agreeable to the intention of the framers of the statute, for that would be most consistent with the true office of interpretation. *Smith's Com.* 637. Puffendorff says: "That which helps us most in the discovery of the true meaning of the law, is, the reason of it, or the cause which moved the legislature to enact it."

Let us, then, look to the reasons, which induced the people of Arkansas to declare this ordinance. In doing so, we must look to the political condition of the state, prior to, and at the time the ordinance was passed. As a matter of public history, we know, that, however unanimously the people of the state joined in repelling the invading armies, which were penetrating the country, when they did enter, and take possession of it, many remained at home, whilst others deserted the service in which they had entered, and came for protection within the federal lines. That being apprised of this, the president was induced, perhaps from motives of policy, as well as from considerations of humanity and justice, to encourage the people of the state to return to their allegiance, under a civil government in connection with that of the United States. It was within the limits of the country held by the federal army, and by the encouragement thus held out to the people, that the convention of 1864 assembled, in the language of the ordinance, "to establish a state government, loyal to the government of the United States." This was the great object to be accomplished, and for this purpose it became necessary to repeal, or declare void, the ordinances or acts of the convention of 1861, to the extent that they conflicted with the paramount law of the nation. To this extent the act would accord with the leading motive, but no further. That is, evidently, what was meant by the terms, "a constitution in *conformity* with the constitution of the United States," because there could possibly be no conformity in any other respect. It would be no " *conformity*" to the United States constitution, to

declare acts void which did not conflict with it. Additional evi-
dence is furnished of this, from the expressions, *"recognizing the
legitimate consequences of the existing rebellion."* To what con-
sequences do they refer? Perhaps, that the country had been
overrun, and was being laid waste, that the laws had ceased to
be administered in that part of the state occupied by them, and
that the effort to maintain a separate government had become
hopeless and ruinous to them. This is what we may presume
they meant, as the legitimate consequences of the rebellion.
How was this to be remedied? Most evidently, in their opinion,
it was by re-uniting the state government with that of the United
States, in connection with which they had once lived in peace,
and to whom, even then, they looked for protection. To effect
this, they must re-unite the state government, by repealing the
acts which would prevent a re-union; this accomplished, and all
motive for further action ceased.

In further confirmation of this, and to show that the convention
did not intend to be understood, when using the word *"entire,"*
as declaring that there was no valid government framed by the
convention of 1861, and that none thereafter existed, they
expressly say, "they do agree to continue themselves as a free
and independent state."

Thus the language used in the ordinance, as well as the condi-
tion of the country, and the inducements held out by the presi-
dent to the people, to resume their allegiance to the United States,
show that the leading purpose of the framers of the constitution
was, that which a limited construction of the words, " *entire
action*," would effect. And by thus construing the words " *entire
action*" to mean the *entire action of the convention of* 1861, *which
is in conflict* with the constitution and laws of the United States,
all of the other acts of the convention will stand, and the leading
purpose of the framers of the constitution and ordinance of 1864,
be still preserved unimpaired. Otherwise, all government must
fall: for no government can exist without a constitution in which
there is the necessary power delegated.

The words, "*all the action of the state*," in the second clause of the ordinance, should receive a like limited meaning, because if all the action of the state, legislative, executive, judicial, and military, without limitation, should be held void *ab initio* the *proviso*, which declares that the "rights of individuals" are excepted, can have no effect; because it is utterly inconsistent, to declare all void, and still that a part shall be preserved. Nor will it do to say that the rights of individuals, *not to be affected*, are such as did not arise out of or depend upon state action; because as no rights were declared void, except those arising out of state action, no proviso was necessary to preserve them—any other rights would not, in any event have been affected.

But by construing the words, " all the action of the state," to mean all of the action of the state, under the constitution of 1861, which is in conflict with the constitution of the United States, shall be void, the rights of individuals as contradistinguished from the rights of the government, would be preserved. The words, "individual rights," clearly point to a class of rights distinct from those which belong to government, and favor the construction which limits the meaning of the words, "*entire*," and "*all*," in their several connections.

By thus giving to these words a limited meaning, in harmony with the leading purpose for which the convention of 1864 was called together, we are aware that there are words and sentences in the ordinance, which would be surperfluous; but by leaving these as superfluous and unnecessary, we may preserve and give effect to the ordinance, according to what appears to us to have been the obvious intention of the framers of the constitution, and can thus best avoid the most absurd and disastrous consequences. Owing to the peculiar wording of the ordinance, an attempt in any other way, to reconcile and bring in harmony its several parts would but lead to like results.

Thus, if we give to the word " entire," an unqualified meaning, the constitution of 1861 must be treated as a nullity—void from its inception. That which is absolutely void, is in law nothing.

If nothing—of no effect—a legislature, courts and officers could not exist under it; something can never depend for existence upon nothing. It would be sheer nonsense to declare the acts of courts void, when there were no courts—could in the nature of things be none; or to hold valid certain acts of officers, when there could be no officers.

And so too, if we give the words, " *all the action of the state*," an unlimited meaning, and hold all such action void, there can be no possible use for the *proviso*. Unless the words, "rights of individuals," were intended to qualify the general terms, and except something that would otherwise have been embraced therein, and held void, there could be no use for any proviso; because, as we have already seen, the *proviso* would be mere surplusage.

Any attempt, therefore, to reconcile the several parts of the ordinance must result in leaving some of the language used unnecessary and meaningless. If we should adopt the latter construction as the true one, in doing so we must depart from the obvious purpose for which the convention was called, and substitute in its stead, purposes and acts, which could only have resulted from very great ignorance, or an utter disregard to the laws of war, the precedents in the history of modern revolutions, the decisions of our highest courts, made by our most distinguished judges, and to every prompting of humanity. No civilized nation, even after conquest by a foreign power, ever failed to respect the private rights of property of the great mass of the people. But that a convention, called by the people of a state, to remodel their constitution so as to make it conform to the constitution of the United States, would intentionally, in a spirit of wantonness and cruelty unprecedented, with one sweep of the pen throw into chaos and confusion, all of the action of the state government for years—a government too which perhaps many of them had contributed to make, whose laws they had helped to execute, and for whose defence their arm or voice, had, at one time or other, been raised, we cannot believe. Nor can we, in view of all this,

indulge in conclusions so damaging to human nature. But, under the sanction of our own decisions, repeatedly approved by this court, we will adopt and uphold that construction most consistent with the general intention of the framers of the constitution of 1864, which will lead to no such absurd consequences.

It, therefore, only remains for us to say, that after the most careful and deliberate consideration of this question, we are satisfied that the ordinance of the convention of 1864 made void the action of the convention of 1861, only so far as the same was in conflict with the constitution and laws of the United States; and consequently, that the judgment of the Pulaski circuit court was a valid judgment, and that the court below erred in sustaining the motion of the defendant, and in rendering judgment thereon, quashing the execution issued upon the judgment rendered in said court, at the September term thereof, 1861.

Let the judgment be reversed and set aside, and the cause be remanded.