## PENN, ET AL. *v.* TOLLISON.

CONSTITUTIONAL LAW.—The people of a State have a right to alter or re-
form the government in the manner provided by the organic law, so long
as they do not ignore or deny allegiance to the national government, or
invade the provisions of the Constitution of the United States.

CONSTITUTION OF 1836—*Not destroyed by Convention of 1861.*—While there
was no act of violation, nor was there any thing revolutionary in the
assembling of the convention, which met at Little Rock, on the 4th of
March, 1861, in pursuance of the act of January 15, 1861, yet the
attempt by that body, by the passage of the ordinance of secession, to
repeal the "act of acceptance" of the compact, to absolve the citizens of
the State from their allegiance to the United States; the adoption of the
Constitution of the "Confederate States;" the appropriation of the pub-
lic domain and other property, and the adoption of a new Constitution,
did not destroy the State government of 1836; and all such action on the
part of the Convention was null and void, for the want of power.

The people, in their sovereign capacity, did not authorize the Convention
to establish a new government; it was assembled for no such purpose;
the act assembling it conferred no such power, and they were not author-
ized to make a new Constitution.

The convention might have had power to adjourn from day to day, but the
President had no power to convene it at will, and as a Convention, it was
*functus officio*, when it adjourned on the 10th of March, and all its acts,
subsequent to that time, were absolutely null and void, and without
authority or sanction on the part of the people.

The people are as much bound to their allegiance by the Constitution of the
United States, as their servants, and the moment the Convention at-
tempted to abjure its allegiance, it became revolutionary, and all its sub-
sequent acts nullities, even with the sanction of the people.

Conquest and occupation by a foreign foe, can, alone, excuse or suspend a
citizen of the State from allegiance to the United States.

States have no existence, politically, outside of and independently of the
Constitution of the United States, and it rests with Congress to declare
what government is established in a State and they must recognize it.

The Convention was not in the exercise of rightful inherent powers, and the
government formed or attempted to be formed, was not a *de facto* gov-
ernment.

There is no such thing as a *de facto* State, known to the Constitution of the
United States.

To constitute a *de facto* officer, there must be a rightful government.

This court does not regard a service made in 1861, by a Confederate court, as
valid, and a decree rendered thereon is a nullity.

35

*Appeal from Crittenden Circuit Court.*

HON. L. H. MANGUM, Special Judge.

*Watkins & Rose,* for appellants.

The infant appellant, Littleton Penn, was never properly notified of the original bill. The orders of publication were insufficient, as they neither showed what the lands were, nor what charge was sought to be enforced against them. *See Brodie v. Skelton, 11 Ark., 120; Clark v. Strong, 13 ib., 491; Suffold v. Suffold, 14, ib , 408.* However, these orders, such as they were, do not appear to have been published.

The plaintiff then endeavored to get service under the provisions of *sections 17, 18, ch. 28, Gould's Digest. See, leave granted by the court to serve in this manner, transcript, p. 74, and affidavit of such service, p. 254; and see also recitals of decree thereupon, tr. p. 29.*

These recitals, more the creation of the clerk than of the court, in a general way it may be said, would in no event be of service. *Brodie v. Skelton, 11 Ark., 120; Murphy v. Williams, 1 ib. 376; Kimball v. Merrick, 20 ib. 12.*

To make a good service under this statute it must appear:

*First.* That the copy of the bill and notice of the commencement of the suit was delivered to each defendant.

*Second.* That the service should be made (1) outside of the State of Arkansas, and (2) within the limits of the United States.

*Third.* It must be made forty days before the term at which the defendant is required to appear.

The service was made on the 5th April, and the court was held on the 14th of May. *See tr. pp. 255 and 75.* One of the days ought to be excluded. *Vandenberg v. Van Rensallaer, 6 Paige, 147; Jackson v. Valkenburgh, 8 Cowen, 260.*

The only notification, then, defendants ever had of the pendency of the supplemental bill, which spoke of a new and ex-

tensive field of litigation, was by an order of publication made at the September term, 1861, pending the rebellion. Will the court hold this to be good, or null and void to all intents and purposes? If the latter, then the infant appellant was never in court on the case made by the supplemental bill. Of course it was necessary for the plaintiff to ge service on all the parties on the supplemental bill before they could proceed at all. *3 Daniel's Ch'y Pl. and Pr. 1680.* Even if this publication were good as to the proceedings on the supplemental bill, there having been no proper service in the case made by the original bill, the decree rendered on that bill must be reversed. The appearance for the infant, by a guardian *ad litem* was nugatory, if the infant had not been properly served with process. See *James v. James, 4 Paige Ch'y, 119; Walker v. Hallett, 1 Ala. N. S. 379; Johnston v. Hainsworth, 6 Ala., 443; Daniel v. Hennegan, 5 J. J. M. 48.; Graham v. Sublett, 6 ib., 44. See also Gould's Dig., sec. 6. chap. 28; sec. 43, ch. 133; Clark v. Gilmer, 28 Ala., 265; Rutherford v. Richardson, 1 Sneed, 609; 18 B. Mon. 558; 9 Ind., 132, 181.*

*English, Gantt & English and Pike & Adams,* for appellee.

The original decree is not now before the court, but if the court could look back, and inquire into its regularity, the supposed errors urged against it are imaginary.

It is objected that the original decree was rendered against Littleton Penn, a minor, without his being properly served with process.

He was served with a copy of the bill, and notice of the commencement of the suit, in accordance with *sec. 17, chap. 28, Gould's Dig., 221;* and the service was proven by affidavit, as provided by *sec. 18,* of the same *chapter.* (*Transcript, p. 254.*)

But, say the counsel for the appellants, this service was only *thirty-nine* days before the commencement of the term at which the party was required to appear, and not forty days, as provided by the statute.

The service was upon the 5th of April, 1855. The appearance term commenced on the 14th May, 1855. (*Transcript, p. 75.*) Had a decree by default have been rendered at the appearance term, on this service, it might have been irregular for want of full time. But no decree was rendered at that term. On the contrary, Redman was appointed a guardian *ad litem*, for Littleton Penn; and, on his request *thirty* days was given him to file his answer. (*Transcript, p. 79–80*) Redman having failed to answer, was removed, and Moore appointed guardian, etc., who filed an answer for the infant, denying the allegations of the bill, May 21, 1856. (*Transcript, p. 36,*) and the cause heard, and the original decree rendered not until the May term, 1856, more than a year after Littleton Penn was served with process.

But we will not further discuss the regularity of the original decree, from which there was no appeal, and which is not now before the court.

Against the regularity of the decree rendered finally on the supplemental bill, answers, etc., and from which this appeal was granted, it is urged:

That the only notice which the appellants had of the filing of the supplemental bill was an order of publication made at September term, 1861, and it is suggested that this order of publication was void, because the *rebellion* was then going on!

It was, perhaps, not necessary to give the defendants below notice of the filing of the supplemental bill. They had prosecuted their appeal, obtained a reversal of the decree confirming the sale, the mandate of this court was sent down and filed, and they were in court, and bound to take notice of any steps taken in this cause. See *Digest, chap. 28, sec. 55; Trustees R. E. Bank v. Bozeman et al.; 15 Ark., 321.*

But, grant that notice of the filing of the supplemental bill was necessary, the joint and several answer of all the defendants, including Littleton Penn, to the supplemental bill, was filed on the 9th November, 1861. (*Transcript. p. 172, 183.*) And this was a waiver of notice, if none had been given.

Moreover, the separate answer of Littleton Penn, by his guardian, *ad litem*, to the supplemental bill, was filed. (*Transcript, p. 198-9-208.*)

Notice of the filing of the supplemental bill was given to Littleton Penn, by order of publication, made it is true in September, 1861, and proof of publication was filed at November term, 1861, and during the *rebellion.* (*Transcript, p. 205, 206;*) and because a rebellion was then going on, the counsel for appellants gravely suggest that this order of publication was a nullity, etc.

As far as our research has extended, Mr. JUSTICE BARTLETT, in *Filkins v. Hawkins,* is the only American or English judge who has decided that the ordinary judicial proceedings of the courts, made during a rebellion, but in no way in aid of it, were void, and the opinion of that learned judge was reversed by this court.

Surely, this order of publication was not in *aid of the rebellion,* but a simple incident occurring in the ordinary administration of justice, necessary to peace and good order, and valid, according to the opinion of Mr. CHIEF JUSTICE CHASE, in *Texas v. White, 7 Wallace Rep., 733;* and so the Supreme Court of the United States held, in *White v. Cannon, 6 Wallace, 443,* that a judgment rendered by the Supreme Court of Louisiana, during the rebellion, was not void, but valid.

McCLURE, C. J.

This cause was before this court, at the October term, 1859, but the question then involved, is not at all similar to the one now presented. From an examination of the case, before presented, it appears that Mrs. Tollison filed her bill to enforce a vendor's lien against certain lands in Crittenden county. In June, of 1856, she obtained a decree for $8,603 66, and the Planters' Bank of Tennessee, a decree for $2,811 65, and the lands described in the bill were ordered sold, for cash, to satisfy these decrees.

On the first of September, 1856, the lands were offered for

sale, and Mrs. Tollison became the purchaser. The master and commissioner made his report of sale at the November term of 1856. To the report the defendant filed exceptions and moved the court to set aside the sale. The exceptions were over-ruled and the sale confirmed. To the _over-ruling_ of the _exceptions_, and the confirmation of the sale, the defendant excepted and appealed to this court. This court reversed the decree of confirmation, set aside the sale and ordered the property sold.

On remanding the cause, Mrs. Tollison filed a supplemental bill, in which she sets up the proceedings in the original decree, the sale, that it was set aside, and that since the rendition of the original decree, she has been compelled to pay $2,678 43 to the Receiver of the Real Estate Bank, in satisfaction of a prior lien, that the Penns were bound to discharge, and which she was compelled to pay to prevent a sale of the lands; that she has paid $601 36 taxes on said land, which she asks may be decreed to be a lien against said lands. To this bill she makes Benjamin W. Ellis, the administrator of James D. Penn, deceased, a party, and also the following named persons: Benjamin W. Williamson, Martha O. Penn, Littleton Penn (an infant) Josiah Deloach, Olive Deloach (his wife), James Penn, and the Planters' Bank of Tennessee. At the September term, 1861, service was had on Littleton Penn (an infant) by publication, and the cause was set down for hearing at the next term.

The late rebellion seems to have interrupted the administration of justice in the courts, and as appears by the record, no further proceedings were had in the case until after the 27th day of August, 1866. The cause was tried by a special judge, and it was decreed that the complainant recover of the defendants the sum of $8,605 66, with interest thereon from the date of the rendition of the original decree, and the further sum of $1,339 87, and in default of payment within ninety days, that the commissioner sell the same to the highest bidder, etc. The Hon. J. J. Clendennin granted an appeal and supersedeas, and thus the case now stands in this court.

The counsel for the appellants raise many questions, not

only to the decree rendered on the supplemental bill, but as to the decree rendered on the original bill. We will first consider the point urged against the decree upon the supplemental bill. Notice of the pending of the supplemental bill was made by an order of publication, at the September term, 1861, on Littleton Penn, a minor, *during the rebellion*, and proof of publication was filed at the November term, 1861.

Counsel for the appellants ask, "will the court hold this service good, or null and void to all intents and purposes? If the latter, then the infant appellant was never in court on the case made by the supplemental bill." This question involves the validity of service, and the authority of courts acting in this State from March 4, 1861, to March 13, 1865. The counsel for the appellee say, that the question of the validity of service and the authority of the courts in this State, in September, of 1861, and during the rebellion, is settled by the case of *Hawkins v. Filkins, 24 Ark. 286.*

Since the decision of the case of *Hawkins v. Filkins, 24 Ark., 286,* the people of the State of Arkansas have framed and adopted a Constitution, the phraseology of which is not exactly the same as the provision existing at the time, and construed by the court alluded to, and for this reason the question is not *res adjudicata,* as counsel intimate.

The Constitution of 1864 declared that, "*all* the action of the State of Arkansas, under the authority of the Convention that assembled at Little Rock, on the 4th of March, 1861, its ordinances or its Constitution, whether legislative, executive, judicial or military, was and is hereby declared null and void. *Provided,* that this ordinance shall not be so construed as to affect the rights of individuals, or to change county boundaries or county seats, or to make invalid acts of justices of the peace, or other officers, in their authority to administer oaths, or to take and certify acknowledgments of writing or in the solemnization of marriage." This language, we say, received construction in the case of *Hawkins v. Filkins, 24 Ark., 286,* but the language of the Constitution we are called upon to con-

strue, cannot be made to conform to the course of reasoning laid down in that case. The material difference, in the two Constitutions, consists of the difference of the provisos. In the Constitution of 1864, the proviso is, that the ordinance "shall not be so construed as to affect the *rights of individuals.*" This language, it is admitted, is not very definite as to just what "rights of individuals" were intended to be protected. But not so, as to the Constitution of 1868. It provides that the ordinance "shall not be so construed as to affect the rights of *private* individuals, *arising under contracts between the parties.*"

The rule laid down in the case of *Hawkins v. Filkins, 24 Ark., 286,* is, "If the ordinance is consistent in its provisions and unambiguous in its language, the *intention* of the Convention is to be ascertained and carried into effect according to the ordinary meaning of the language used." This rule will be strictly adhered to in the case now before us.

In construing the provisions in the Constitution of 1864, the court said, in the case of *Hawkins v. Filkins, 24 Ark., 286,* the "rights of individuals," sought to be preserved, extended to and included the right to sue and pursue all the remedies known to the law for the enforcement of civil rights, and protected, and was intended to protect rights acquired by the action of courts organized under the Constitution of 1861. Keeping this decision in view, now let us turn to the proviso in the Constitution of 1868, and see if the construction placed on the proviso in the Constitution of 1864, can be reconciled with the language used in the Constitution of 1868, and if it cannot, then we must seek for the *"intention* of the Convention" according to the ordinary meaning of the language used.

The Constitution of 1868 declares that the only "rights" sought to be protected, are such as grew out of *"contracts between the parties,"* and that all other action of the legislative, executive, judicial or military arm of the State government, save acts changing county boundaries, county seats, acts of justices of the peace in administering oaths, certifying the acknowledgment of deeds or the solemnization of marriages,

is absolutely null and void.   The mere fact that the Convention of 1868, in framing the Constitution, did not follow the exact language used in the proviso of the Constitution of 1864, is, to our minds, a circumstance going to show that they did not acquiesce in the construction placed on that clause of the Constitution of 1864, by the court in the case of *Hawkins v. Filkins*, (*24 Ark.*, *286*,) and the use of the word "*private*," before individuals, and the additional words "*arising under contracts between the parties*," after the word individual, to our minds, is conclusive that they were inserted for some purpose, and that purpose was, to limit the "rights" protected to "private individuals," and to declare the entire political action of the State, under the Constitution, null and void.

One of the questions propounded by the court in *Hawkins v. Filkins*, (*24 Ark.*, *286*,) is, "did the passage of the ordinance of secession, and the revolutionary action of the State, destroy the State government of 1836, or make invalid the acts of her civil government (of 1861)."   Precisely the same question that arose in that case, is presented in the case now under consideration.

The thirteen colonies that framed and adopted the articles of confederation, signed at Philadelphia, on the 9th of July, 1778, entered into "a league of friendship with each other for their common defense, the security of their liberties and their general welfare, binding themselves to assist each other against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade or any other pretense whatever," (*Art. 3, Art. of Confederation.*)   Under the articles of confederation, each State had the sole power of regulating its form of government, and it was supposed to have had power sufficient to keep down all internal dissensions.   On the 25th of May, 1787, a Convention of deputies, from twelve of the colonies that composed the government formed under the articles of confederation, assembled at Philadelphia, and framed what is now known as the Constitution of the United States. The Constitution thus framed, was adopted by the people of

the colonies, and is unlike the articles of confederation in many respects, a few of which may be mentioned: *First.* It declares that "the *people* of the United States, in order to form *a more perfect union*, establish justice, *insure domestic tranquility*, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and posterity, do ordain and establish this Constitution for the United States." There are two things noticeable between the preamble to the Constitution of the United States and the articles of confederation, to which we shall direct attention; the first of which is, that the "*people*," and not the *colonies*, were to form the new government. The second and additional object was "*to secure domestic tranquility*," a thing not embraced within the original articles of association or confederation. In the first instance the object seems to have been to abolish the government formed by the *colonies*, and in its stead, rear a government formed by the "*people*." In the second, the object seems to have been to provide a means, not then provided, to "secure domestic tranquility" in the different States by the use of the strong arm of the new government."

*Second.* It declares that "no State shall enter into any treaty, alliance or confederation."

*Third.* It is made treason to levy war against the United States, or to adhere to its enemies, or. to give them aid and comfort.

*Fourth.* It declares that "the United States shall guarantee to every State in the Union a republican form of government, and shall protect each of them against invasion, and, on application of the Legislature, or of the executive (where the Legislature cannot be convened) against domestic violence."

*Fifth.* It declares that the "Constitution and the laws of the United States, made in pursuance thereof * * * shall be the supreme law of the land, and the *judges* in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

*Sixth.* It declares that "members of the several State leg-

islatures, and all executive and *judicial officers*, both of the United States *and the several States*, shall be bound by oath or affirmation, to support the Constitution" of the United States.

There are many other differences that might be mentioned, but enough have already been stated to show that another form of government was intended to be created, and that the object was to create a nation or government of delegated powers, by the people.

We will now pass on to the year 1803, the time at which the United States acquired the territory from France, out of which Arkansas is formed. From this point we will pass along to the year 1819, when we find Congress providing a territorial government for the territory that now composes the State of Arkansas, and from that date, until June, of 1836, when we find that the Congress of the United States admitted Arkansas as a "new State" into the Union. In the act of admission, the assent of the State of Arkansas was irrevocably required and given, that "without the consent of the United States, the State should never interfere in the primary disposal of the soil within the same, by the United States, nor with any regulations Congress may find necessary for securing the title in such soil to the *bona fide* purchasers of the United States."

We have recited these facts and circumstances for the purpose of showing that the State of Arkansas, admitted into the Union in June, 1836, became a member of the Federal Union, and subject to all the restrictions imposed upon the other States of the Union.

The public records of the political branch of the government of the United States, in all political questions, binds the judiciary thereof, and we know of no reason why the same rule ought not to be applicable to the judiciary of a State. By the public records of the State of Arkansas, we find that the State, admitted in June, of 1836, continued to live and exist as "a State, republican in form," from the time of its admission until the year 1861.

On the 15th of January, 1861, the Legislature of the State
of Arkansas passed "an act to provide for a State Convention."
The eighth section of said act provides, "That upon the organi-
zation of said Convention, it shall take into consideration *the*
*condition of political affairs*, and determine what course the
State of Arkansas shall take *in the present political crisis*." It
will be borne in mind that the object of the Convention, thus
provided for, was not to make a new Constitution, but "to
take into consideration *the condition of political affairs*, and de-
termine what course the State of Arkansas should take *in the*
*present political crisis*."

The Convention, provided for, assembled at Little Rock on
the 4th of March, 1861, and was composed of delegates elected
by the people. In calling this Convention there was no act of
violation, nor was there any thing revolutionary in its assem-
bling; for the people of a State have the right to alter or reform
the government, in the manner provided by the organic law,
so long as they do not ignore or deny allegiance to the national
government or invade the provisions of the Constitution of the
United States. Whether the Convention, assembled at Little
Rock on the 4th of March, 1861, kept within these limits re-
mains to be seen.

The Constitution of 1836 was ordained and established "for
the government of the State of Arkansas." It distributed cer-
tain powers among various departments, giving to one depart-
ment executive power, to another legislative power, and to
another judicial power, and pointed out the means by which
the persons should be chosen to execute and exercise the powers
of the several departments. The national government recog-
nized the heads of these departments and their subordinates, as
constituting the executive, the legislative and judicial power
of the political State of Arkansas. In short, the Constitution
of 1836, created a political State, and the functions thereof
were exercised by the persons designated to exercise the power
conferred. The State thus created, owed allegiance to the
national government, that could only be revoked by successful

revolution. With this allegiance kept constantly in view, we will now turn our attention to the records of the Convention.

By an examination of the records of that body, we find that on the third day of the Convention, A. C. Spain, had his credentials, as a Commissioner from the State of South Carolina, presented to the Convention. With his credentials, was presented a certified copy of an ordinance, "To dissolve the union between the State of South Carolina and other States united with her under the compact entitled, the Constitution of the United States of America." Mr. Spain, also, presented a copy of a "Declaration of the immediate causes which induce and justify the secession of South Carolina from the Federal Union." This gentleman was, thereupon, invited to a seat within the bar of the Convention. D. P. Hill had his credentials, as a Commissioner from the State of Georgia, presented to the Convention. Among other documents submitted by him to the Convention, are certain resolutions adopted by the people of Georgia, "as to the right and duties of Georgia to secede from the Union, and her policy after doing so, toward certain other States." Mr. Hill also submitted a copy of a resolution or ordinance adopted by the State of Georgia, "to dissolve the union between the State of Georgia and other States, once united with her under a compact of government, entitled the Constitution of the United States of America." This gentleman was also invited to take a seat within the bar of the Convention. On the 16th of March, 1861, W. S. Oldham presented to the Convention his appointment as a Commissioner of the "Confederate States," signed by Mr. Davis. This gentleman was also invited to take a seat within the bar of the Convention.

These things are mentioned at this point, for the purpose of directing attention to the class of men invited within the bar of the Convention, and reference is made to the documents presented, and the cause represented, for the purpose of keeping before the mind, the fact, this Convention was representing the sovereignty of the State; that it was charged with deter-

mining what course the State of Arkansas should take in the then political crisis. With these things kept well in view, we will continue to trace the action of the Convention.

On the 6th of May, 1861, the Convention passed "An ordinance to dissolve the union now existing between the State of Arkansas and the other States united with her, under the compact entitled, the Constitution of the United States of America." This ordinance repeals, or rather attempts to repeal, the provisions of the "act of acceptance," of the compact, made between the Legislature of Arkansas and the United States, on the 18th of October, 1836. It also declares, that "the citizens of the State of Arkansas are absolved from all allegiance to the United States, and that the State of Arkansas is in the possession and exercise of all the rights and sovereignty which appertain to a free and independent State." On the 10th of May, 1861, the Convention, by ordinance, pledged the allegiance of the State of Arkansas to the "Confederate States of America," and adopted the Constitution of the Confederate States, that had been accepted and adopted by South Carolina, Georgia, Flordia, Alabama, Mississippi, Louisiana and Texas.

On the 11th of May, 1861, the Convention passed "an ordinance appropriating the domain, public lands, and other property, which belonged to the United States government, in this State, on the 6th of May, 1861," to the State of Arkansas. This ordinance declares, "That the domain, public lands, and other property, which belonged to, and vested in the government of the United States, situate in this State, on the 6th of May, 1861, be and the same are hereby appropriated to the State of Arkansas, as the domain, public lands, and property of said State, to be hereafter disposed of, applied and appropriated, as the other domain, public lands, and property of this State, hereby declaring that all the rights, title and claim which heretofore vested in said government of the United States, of, in and to said domain, public lands and other property, now vests and belongs to the State of Arkansas, subject to be disposed of as hereafter

may be provided by the General Assembly of the State of
Arkansas." This action, to some extent, may be regarded as
an attempt, "to interfere with the primary disposal of the soil
of the United States," and in violation of the ordinance and
acceptance of compact, "of October 18, 1836, whereby the State
of Arkansas, freely accepted, ratified and *irrevocably confirmed*
the compact of union between herself and the United States."
Persons convicted of crime, in the courts of the United States,
and confined in the penitentiary of the State, were authorized
to be pardoned by the Governor of the State, by the ordinance
of said Convention ; the ordinary revenue of the State was ap-
propriated with a lavish hand, to arm men to swell the ranks
of the Confederate army, and the drama closed by the *adoption
of a Constitution* which recognized no allegiance, on the part of
the people of Arkansas, toward the government of the United
States. All of this did not destroy the State government
made by the people of the State of Arkansas in 1836, and it
may well be said, that the action of the Convention, up to this
point, was void for want of power. It may be asked what
action did destroy the Government of 1836, if it was not done
by the acts enumerated ?

We have said that the closing act of the drama, enacted by
the Constitutional Convention of 1861, was the adoption of a
Constitution which recognized no allegiance, on the part of
the people of the State of Arkansas, to the government of the
United States. The officers of the State government of 1836,
from the highest to the lowest, by an ordinance of the Conven-
tion, were required to, and did take an oath "to support the
Constitution framed by the Convention of 1861, and all ordi-
nances and resolutions passed or adopted by the Convention,
and true allegiance to bear to the State of Arkansas (of 1861)
and to the Confederate States of America." By the 8th Sec-
tion of Article VIII, "all officers, civil and military, holding
commissions under authority of the Constitution of 1836, were
continued in the same offices under the Constitution of 1861."
Thus the State government created by the Constitution of 1836,

was deprived of all vitality; the members of the legislature, the executive and judicial officers, who were bound by oath or affirmation, "to support the Constitution of the United States and of the State of Arkansas," (of 1836) ceased to do so, and entered upon similar duties under the Constitution of 1861, and transferred their national allegiance to the Confederate States.

The court, in *Hawkins v. Filkins, 24 Ark. 286,* says, "there was no change in this State government; that the ordinance of secession neither added to, nor detracted from the Constitution, and that it was not intended by the Convention to destroy the State government." We think we have shown that there *was* "a change in the State government," when all the officers abandoned and deserted their respective positions, from a State known to the Union, and entered upon similar duties under the provisions of a Constitution which was in antagonism to the Constitution of the United States; and having shown this, let us see if it be true that "the Constitution did not intend to destroy the State government?" It is true that the Convention did not intend to destroy *all* State government, but it did intend to destroy the State government and Constitution made in 1836. Without destroying it, the friends and advocates of secession had no means whereby the Confederate States could be aided in their struggle, save by entering into open rebellion. Without destroying the State government of 1836, the President of the United States could have called upon the executive for troops. When the army of the United States subdued the rebellion, in the State of Arkansas, in all the State of Arkansas there was no person who ever claimed to belong to the State government of 1836, or who claimed to be an officer of the same. When the federal arms had restored peace, within the borders of the State, they found the Constitution of 1836 and that of 1861. That of 1861 was hostile to the federal government, and because it was formed in aid of the rebellion, could not be recognized. They then involuntarily turned to the Constitution of 1836, and found it like the engine whose

motive power is gone, a perfect, but dormant instrument. The executive, who stood at the head of that department, and his many subordinates could nowhere be found. The legislative branch of the government had ceased to exist by reason of the limitation placed upon the term of office, and the judicial branch of the government, from the highest to the lowest, was without a representative. Here was the Constitution of 1836, and the people who framed and adopted it, but there was no officer or person clothed with the legal power of filling the vacancies in the several departments, or who was authorized, either by the Constitution or laws of the State, to call an election, and yet we are told that the State government was not destroyed, in the State of Arkansas, by reason of the rebellious acts we have mentioned. We are told that the State may have a form of government at variance with and antagonistic to the federal government and still be a State in the Union. We are told that that clause of the Constitution of the United States, which requires the legislative, executive and judicial officers of a State to support the Constitution of the United States, is not binding upon those officers, and that they may discharge their respective duties at a time and during a period in which they have ignored allegiance to the United. States, and at a time when they have sworn allegiance to a government at war and hostile to the government of the United States. We do not believe in any such dogmas. The idea that the people of a State may, at their pleasure, set up a form of government inimical and hostile to the government of the United States, and that all its acts, not in conflict with the express provisions of the Constitution of the United States, during the period it has been incubating treason, are legal, valid or binding, is a heresy that should not emanate from the highest judicial tribunal of a State.

In the case of *The State v. Williams*, the question was discussed whether or not the office of attorney general did not become vacant when Williams left the Confederate lines and took the oath of allegiance to the United States government.

36

The judiciary that decided and discussed this question recognized the Constitution of 1861 as the fountain from which they drew judicial power. They regarded the Constitution of 1836, and the government-formed under it, as one of the things of the past, and if it had been intimated to that court that they were *de facto* judges, under the government formed by the Constitution of 1836, they would have treated the intimation with scorn. We are not quoting the case of *The State v. Williams*, for the purpose of endorsing the doctrine or dicta therein enunciated, but for the purpose of showing that the highest judicial tribunal, created by the Constitution of 1861, did not claim or pretend that the action of the State of Arkansas, in either a legislative, executive or judicial character, did not depend for its validity on the fact that the act, complained of, was not in conflict with the Constitution of the United States.

It appears from the opinion of Judge PIKE, that Williams sought and obtained the office of attorney general; that he held and exercised the duties of the office for sometime, and afterwards came within the federal lines and took the oath of allegiance. A proceeding, by *quo warranto*, was brought before the Supreme Court, and Judge PIKE, speaking for himself and Judges ENGLISH and COMPTON, said: "The mere taking the oath of allegiance to the United States, without more, was an abandonment of any office under the Confederate States, or under the lawful government of the State. It was the desertion of a post of duty, infinitely worse than desertion by a soldier of his colors and going over to the enemy to turn his bullets against the bosoms of his former comrades." Now it is submitted, that if the mere taking of an oath of allegiance, by one who was an officer under the Constitution and government formed in 1861, to support the Constitution of the United States, *eo instanti*, rendered that office vacant, that an oath of allegiance taken to support the Constitution of the Confederate States vacated all the offices recognized by the Constitution and laws of 1836. We cannot conceive of any condition of

affairs that would authorize us to tolerate the acts of persons, as legal, who, claimed to exercise judicial functions, who, in the exercise of these functions, were sworn to disregard the Constitution of the United States, or who had solemnly sworn they would not recognize it as the supreme law of the land; and such was the attitude in which the officers of the State government, formed by the Constitution of 1861, were placed.

In *Hawkins v. Filkins*, the learned judge lays down the doctrine, that "even in time of civil war, government and law remain absolute necessities," and that without these, "the whole people of the State would be left without law and without government; that life, liberty and property, would be left to the mercy of brutal violence, and to the mercy of those who can only be restrained from violence by law." Before the passage of the Constitution of 1861, the people of the State of Arkansas had a government that, in time of civil war, would have furnished protection to life, liberty and property. For a period of twenty five years the Constitution of 1836 had furnished her citizens with all the protection of life, liberty and property that they desired or required. The government in existence, prior to March 4, 1861, was as capable of furnishing protection to the citizen, during a period of civil war, as the government formed under the Constitutions of Ohio, Indiana and Illinois.

If there had been no civil government existing in Arkansas, prior to 1861, it might, with some plausibility, be argued that some kind of State government was necessary, and that, under such circumstances, the acts of that government ought to be sustained, in order to preserve the rights of the citizens of the States, but such a theory cannot be argued, because there was a good and valid State government in existence when the Convention of 1861 assembled. The government, formed by the Constitution of 1861, was not a *necessity*. On the contrary, the object of its framers was to render the government, formed thereunder, an instrument, by which a dissolution of the Union could be brought about, and on the ruins of which might be

builded a government, whose highest ambition was the perpetuation of African slavery. It is admitted, in *Hawkins v. Filkins*, that the people of Arkansas owed allegiance to the United States to the extent of her delegated powers, for national purposes, but it is insisted that this allegiance ceased, the moment the laws, which protected the citizen, were suspended. Waiving, for the present, all argument on the question as to whether the people of Arkansas could suspend the laws, and afterwards plead their own wrong in bar to the allegiance they owed the United States, we will now proceed to inquire what power Arkansas delegated to the general government, when she was admitted into the Union. Section ten, of Article one (*Con. U. S.*) says: "No State shall enter into any treaty, alliance or confederation." Here we have the mandatory and prohibitory command of the Constitution, prohibiting just what was attempted to be done by the framers of the Constitution of 1861. The ordinance of secession was passed on the 6th day of May, 1861, and the Constitution of 1861 was adopted by the Convention on the 1st day of June, of that year. At the time the Convention passed the ordinance of secession there was no "civil war" in Arkansas, nor was there at the time the Convention adopted the Constitution of June 1861. So far as the public records of the country are concerned, and it is by these we must be guided, there is nothing showing that Arkansas was in a state of civil war or rebellion until August 16th, 1861, at which time the President issued his proclamation of the fact. These things go to establish the fact that the ordinance of secession, and the creation of a new government under another Constitution, were not political acts intended to provide the people of Arkansas with a civil government, during a period of civil war ; but on the other hand, they point with unerring certainty to the fact, that these acts were intended to precipitate the people into revolution, and place the sovereignty of the State into the hands of men, who would use it to destroy a government they all had taken a solemn oath to support and defend.

This brings us to another view of this question. Judge Story says: (*Story on the Constitution, vol. 1, page 243.*) "*The people,* and the *people only,* in their original sovereign capacity, have a right to change their form of government." Now the question arises: "Did the people, in their original sovereign capacity, in any manner, accept the government, formed by the Constitution of 1861?" It will be borne in mind that the sole object of calling the Convention of 1861 was, to "take into consideration the condition of political affairs, and determine what course the State of Arkansas shall take in the present political crisis." The question, as to whether the Convention should be called, was submitted to the people, and it appears that a majority of the legal voters, voting, favored the call. This being true, there was unquestioned authority for the assembling of the Convention, for, to use the language of Judge Story, "the people, in their original sovereign capacity" had authorized it. But did the people, "in their original sovereign capacity" authorize the establishment of a new State government? We think not. The Convention was authorized, and when assembled, had power only to do two things—first, to "take into consideration the condition of political affairs," and second, "to determine what course the State of Arkansas should take in the then political crisis." The first meeting of the Convention was on the 4th of March, 1861, and it adjourned, on the 21st of the same month, to meet on the 19th of August, 1861. On the day before the Convention adjourned, it passed a resolution or ordinance, providing for the taking of the sense of the electors of the State, on the question of "cooperation" or "secession." Whether the President of the Convention and the friends of secession feared the result of the election about to be held, does not appear from the proceedings of the Convention. But it does appear that the President of the Convention, on his own motion, re-assembled the Convention before any expression of the people could be obtained, and advised and encouraged the passage of the ordinance of secession. The Convention was re-assembled on the 6th of May,

1861, and the ordinance of secession was passed by four o'clock P. M. of the same day. The next step of the Convention was to provide the sinews of war, to be used, in the language of Judge PIKE, "against the bosoms of their former comrades." This action of the Convention, we say, was not the action of the people of the State of Arkansas in their "original sovereign capacity," nor were they bound by it in any respect. Before the ordinance passed, Mr. Dinsmore attempted to get an amendment to it, allowing the people to vote upon the acceptance or rejection of the same, but the amendment was tabled by a vote of 54 to 15. Such action as this evinces the fact, that the members of the Convention no longer desired to consult the will of the people, else why re-assemble the Convention before they could he heard from, and afterwards refuse to allow them the privilege of approving or disapproving the ordinance of secession?

But waiving the question of secession, we will now turn our attention to the subsequent acts of the Convention in making a *new* Constitution. Who authorized this Convention to make a *new* Constitution and put it in operation? The people did not do it; the only power the people clothed the members of the Convention with was, that of taking into consideration the condition of political affairs and determining what action the State of Arkansas should take. This grant of power is not and was not broad enough to authorize the members of the Constutional Convention, of 1861, to make a new government, and make the officers of the old government accept positions under the new.

The Topeka Constitution could not be upheld, because it was called at a time when there was a territorial government in existence in the territory, by a mass Convention of citizens. The Lecompton Constitution could not be upheld, although authorized by the territorial Legislature, because Congress had not passed an enabling act for that purpose. Dorr and his followers, in Rhode Island, attempted to set up a new government, the authority to call the Convention to frame the Con

stitution of which, was derived from the people at a mass Convention. The old authority refused to give up, and the whole thing ended by Dorr being sent to the penitentiary for life. Judge WALKER says, in *Hawkins v. Filkins*, that "no government contested with the State (that is, with the State government of 1861), her right to administer the laws under such government." This is true, but it does not establish the fact, that it was a legal State government. If every officer of the present State government should, on to-morrow, take an oath to support the Constitution of 1836, or 1864, and at once conform their action to either one of these Constitutions, and use the strong arm of the military to compel an acquiescence therein, on the part of the people, would such action make the Constitution of 1864, or 1836, binding on the people? We say, no; and yet this is just what was done by the officers known to the Constitution of 1836. The Convention framed a Constitution which never received the sanction or approval of the people. The officers, elected under the Constitution of 1836, qualified and entered upon the discharge of the duties prescribed by the Constitution of 1861. The strong arm of the military power, of the new government, compelled obedience to the then existing state of things, and yet it is claimed that the government, thus formed, was not only a government *de facto*, but a government *de jure*. If it be true, as enunciated in the great American Bill of Rights, that all just governments derive their powers from the consent of the governed, and if it be true, as Judge STORY declares, "That the *people*, and *the people only*, in their original sovereign capacity, have the right to change their form of government," then it at once becomes clear to the dullest intellect, that there was no government *de jure*, in Arkansas, from the 4th day of March, 1861, to —— 1865.

Immediately after the passage of the ordinance of secession, the Convention arrogated to themselves, by usurpation, all the powers of government. Before the ordinance was passed the executive department of the government refused to

issue a proclamation to fill a vacancy from one of the counties of the State, on the ground that it was not made his duty to do so by any law of the land. The position of the Governor, at that time, shows that it was his opinion that the Convention had no legitimate powers; that its duty was to "take into consideration the condition of political affairs and determine what course the State of Arkansas" should take in the then existing political crisis; that after they had determined this, that the sense of the people should be taken as to the approval or disapproval of the action of the Convention. Gov. Rector, when called upon to issue a proclamation for the election of another delegate, says, "that he perceives no authority under. the Constitution or laws of this State, by which he is authorized to issue a proclamation for the election of a delegate to the Convention on any other day than on the 18th of February last, which duty he has performed; that the act makes no provision for a second election." He concludes his argument on this point by saying, "that a proclamation issued by me, without law, requiring a subordinate officer to do an act which the people have not authorized to be performed, would trench on their reserved rights, and savor strongly of usurpation." That he did not regard the Convention as having any law-making power, may be inferred from the following. He asks, "Can the Convention empower the Governor to perform a ministerial act?" and in response to the question he says, " I think not, under our present system."

In speaking of the power of Conventions, called for a specific purpose, and the Convention which assembled here in 1861 comes under that class, Judge O'NEALL, of South Carolina says; *(2 Hill, 223)* "A Convention, assembling *under the Constitution,* is only the people, *for the purposes for which it assembles,* and if they exceed those purposes their act *is void,* unless it is submitted to the people and affirmed by them." Tried by this rule, the creation of a State government, by the Convention of 1861, was void for want of authority, as no power was conferred upon the Convention to make a Constitution, much less

to make a Constitution and affirm it without the consent of the people. Judge O'Neall continues by saying, "It is true, the Legislature cannot limit the Convention; but if the people elect them for the purpose of doing a specific act, or duty, pointed out by the act of the Legislature, the act would define their powers. For the people elect in reference to that and nothing else." Judge Shaw, (*6 Cush. 373,*) speaking for himself and Judges Putnam, Wilde and Morton, in response to a question submitted to the Supreme Court of Massachusetts, by the House of Representatives, entertains the same opinion as that delivered by the Supreme Court of South Carolina. The question submitted to the court is as follows: "Whether, if the Legislature should submit to the people to vote upon the expediency of having a Convention of delegates of the people for the purpose of revising or altering the Constitution of the commonwealth, in any specified part of the same, and a majority of the people voting thereon, should decide in favor thereof, could such Convention, holden in pursuance thereof, act upon and propose to the people amendments in other parts of the Constitution not so specified?"

In response to this question, the Supreme Court of Massachusetts unanimously say: "Considering that the Constitution has vested *no authority* in the *legislature*, in its ordinary action, to provide, by law, for submitting to the people the expediency of calling a Convention of delegates *for the purpose of revising or altering the Constitution*, it is difficult to give an opinion upon the question, what would be the power of such a Convention, if assembled. If, however, the people should, by the terms of their vote, decide to call a Convention, to consider the expediency of altering the Constitution in some particular part thereof, we are of opinion that such delegates would derive their *whole authority* and commission *from such vote*, and upon general principles, governing the delegation of power and authority, they would have *no right*, under such vote, to act upon and propose amendments, in other parts of the Constitution, *not so specified.*"

The people of Massachusetts, and those of South Carolina, for many years, have been regarded as representing the extreme views of each section of the Union, on political and governmental questions; yet the highest legal tribunals, of those States, agree in saying that constitutional conventions have no power to *create* governments; that their province is to frame the organic law, and submit it to the people for ratification or rejection. The Constitution of Arkansas, like that of Massachusetts, provided the mode and manner of *amending* the Constitution of the State, but it nowhere authorized the legislature to *call a Constitutional Convention.* The question as to whether the Constitution of Massachusetts could be amended, altered or changed in *any other manner* than that pointed out *by the Constitution itself*, was also submitted to the Supreme Court of that State, and in response to the question, the court said: "Considering that previous to 1820, no mode was provided by the Constitution for its own amendment, that no other power for that purpose, than in the mode alluded to, is anywhere given in the Constitution, by implication or otherwise, and that the mode provided thereby appears to have been carefully considered, and the power of altering the Constitution cautiously restrained and guarded, we think a strong implication arises against the existence of any other power, under the Constitution, for the same purpose." These authorities all go to show that there is a limitation on the power of a Constitutional Convention. The notion has been common, among even well informed men, that the Constitutional Convention, when legally assembled, is *above all law*; that "they are a law unto themselves." The origin of this misconception may be traced to ignorance of the history of constitutional governments. The right, of even the people to change their form of government, is limited, in this country, to the form prescribed in the organic law. The entire people of a State, in mass convention assembled, have no more right or authority to overthrow a constitutional form of government than ten of them have.

In the State of Rhode Island, a majority of the people of the State undertook to create an organic law and establish a new government without taking any legal course to obtain the sense of the people on the subject. The action, of this majority, was pronounced revolutionary and void, and the strong arm of the federal government was placed at the disposal of the authorities representing the old government. In speaking of the power of the Convention of 1861, Governor Rector says: "I hold the act passed, calling the people together, as merely suggestive and directory in its nature; that a majority of the people themselves, or through delegates, chosen at their will, could assemble in convention and pass upon the future status of their government, relatively considering the formation of new governments or the preservation of old ones." A committee, who were displeased with the action of the Governor, in a report made to the Convention, makes use of the following language: "A convention of the people is supreme over all the departments of government; that all officers are but servants of the people, and that the people (that is a constitutional convention) have a right to require of them, the performance of any duties within their appropriate and designated spheres of action."

From the authorities we have quoted, it will at once be seen that the concessions of the Governor admitted the supremacy of the Convention to act outside of and independent of the executive of the State, and from the report of the committee, and the subsequent action of the Convention, we find that they were as ready to make the usurpations as the executive was to acquiesce in them. The advocates of the theory that a State Convention, when assembled, may exercise powers amounting to absolute sovereignty; that the convention, when assembled, may exercise the duties and prerogatives of the executive, legislative and judicial departments of the government, is of modern origin. In the early history of the country we find no traces of any such dogmas or heresies. The earliest traces we have been able to find of the doctrine that a Constitutional

Convention represented the supreme power of the State, in all its departments, and that it could control their action, is found in the New York Convention of 1821. It prevailed in a very mild form in the Virginia Convention in 1829, but under the treatment of men like John Randolph, the disease readily yielded to the general practice prescribed by the framers of the Constitution of the United States. In 1836 the infection made its appearance in the Constitutional Convention of Pennsylvania, but its race was extremely short. In 1847, a Mr. Petus carried the infection into the Constitutional Convention of Illinois, and he enunciated the broad doctrine of Louis XIV, that "we are the State." In 1849, it broke out in the Constitutional Convention of Kentucky, and in 1853, in that of Massachusetts under the leadership of B. F. Butler. In 1860 and 1861 the infection assumed its most malignant character, and swept like an angel of death over Arkansas, Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida and Texas. Such force, fraud, usurpation, and treachery on the part of the servants of the people, as those of the ten Southern States witnessed in 1860 and 1861, was never beheld by a civilized world. Fear and consternation were depicted on the countenance of the bravest, and the lawlessness that follows all acts of tyrants and usurpers, hushed for a time, the voice of the people, but silence and acquiesence, thus obtained, cannot be appealed to as evidence to this court of the existence of either a *de facto or de jure* government

In Louisiana the Constitutional Convention of 1844 undertook to fill the vacancies in the office of parish and district judges. In 1862, the Constitutional Convention of Illinois mooted the question of ejecting officers of the State government who had been regularly elected or appointed. The Constitutional Convention of Louisiana *instructed* the proper officers to raise the salary of the teachers of public schools, but in the instance named, the authority of the convention to do these acts, was not recognized by the State governments. In Missouri a Constitutional Convention legislated two judges

out of office, and authorized the *Governor* to fill the vacancies, thus created, by appointment.  A learned writer on this subject, in speaking of the action of that Convention, and as to the validity of such action, says :  "It was not the first time, in history, that a party, having, morally and politically the better case, had the worst of the argument;" thus admitting that the exigency of the rebellion may have furnished an excuse for their action, but that the exercise of the power was without precedent ; *Jamison 313.*  These authorities all go towards showing that Constitutional Conventions are not possessed of the extraordinary powers that belong to the people "in their original sovereign capacity."

It has been stated that the Convention assembled on the 4th day of March, 1861, and that it adjourned on the 21st of the same month, to meet on the 19th of August following.  While it may be conceded that the Convention possessed the power of adjournment from day to day, or to a definite day that would better suit their convenience, it does not follow that it had the power of conferring on the President of the Convention the power to re-convene the Convention, if in his discretion "an exigency should arise requiring the same."  For if this doctrine be conceded, the Convention would have the power to perpetuate itself for all time to come, if the President thereof should be of the opinion that such an emergency had arisen. The Convention, as we have seen, was called for the purpose of "taking into consideration the condition of political affairs, and to determine what course the State of Arkansas should take in the then existing political crisis."  This delegation of power, by the people, did not authorize the Convention to provide for its own perpetuation, or authorize its re-assembling, or any of the revolutionary acts that followed by reason of the action of the Convention.  The whole tenor of the act authorizing the Convention, shows conclusively, that the Convention was little else than an advisory board; that its action was not to be final and absolute, and it must have been so considered, by the members thereof, or they would not have

submitted the question of· "co-operation" or "secession," to the people. We are of opinion that the Convention was *functus officio*, as a Convention, when it adjourned on the 21st of March, and that all its acts subsequent to that date are also utterly null and void, and without authority or sanction on the part of the people. If it be conceded that a constitutional Convention may adjourn, subject to· a call of the President, then the power of perpetuation is conceded. The concession of such a power, as this, would place it in the power of one man to convene the constitutional Convention at any time. It is true that the power was only granted to re-assemble the Convention at any time before the 19th of August, but if it be conceded that the Convention had the power to limit the discretion of the President of the Convention until the 19th of August, it is a concession that the Convention has the power to adjourn subject to the call of the President, at any time, and if this point be yielded, it is an admission that the people have created a body whose power and continuance in office is only limited by their individual views of right and wrong. This court will not indulge in any construction of power that would or might be fraught with so many dangers to the stability of the government, or the peace of society.

The Supreme Court of the United States, in the case of the United States *v. Reynes*, (*9 How'd 153*), in speaking of *de facto* governments and their acts, say: "It may safely be said that claims founded upon acts of a government *de facto*, must be sustained, if it at all, by the nature and character of such acts themselves, as proceeding from the exercise of the *inherent* and *rightful* powers of an independent government." Judged by this rule, was the State government, inaugurated by the constitutional Convention of 1861, a *de facto* government? The solution of this question involves an answer to another, and it is: Did the State of Arkansas, by the terms of her admission, as one of the States of the United States, reserve to herself the power of assuming the "inherent and rightful powers of an independent government" at her pleasure? We all know she

did not, therefore a mere statement of the proposition furnishes an answer to the absurd proposition laid down in *Hawkins v. Filkins.* Continuing, the court, say: "They (such governments) cannot be supported, if shown to have originated *in violation of its own compacts, and in derogation of rights it had expressly conceded to others.*" We think we have shown that the State government, inaugurated and set on foot by the constitutional Convention, of 1861, was not only in violation of the compact entered into when Arkansas was admitted as a State into the Union, but in "derogation of the rights it had expressly conceded to others." When the Convention assembled, Arkansas was a State in the Union, recognizing the Constitution of the United States as the supreme law of the land. Had the Convention continued to recognize the Constitution of the United States, as the supreme law of the land, and created a government in harmony therewith, which had not received the sanction of the people, their acquiescence might, with some degree of propriety, have been claimed as a sufficient recognition to have entitled it to recognition as a government *de facto.* The moment the Constitutional Convention attempted to abjure allegiance to the Constitution of the United States, or attempted to dissolve the allegiance the citizen owed to the national government, that moment it became a revolutionary body, that had outlived its usefulness, and all its subsequent acts were nullities, even with the sanction of the people; for the people, themselves, are as much bound by the provisions of the Constitution of the United States as are their servants. The Supreme Court of the United States in *Luther v. Borden, (7 How'd. 40),* say: "It rests with *Congress* to decide *what* government is the established one in a State; that as the United States guarantees to each State a republican form of government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not."

Article VI, of the Constitution of the United States, declares that the Constitution and laws of the United States, made in

pursuance thereof, shall be the supreme law of the land, and the judges, in every State, shall be bound thereby. It now becomes a pertinent inquiry: Has Congress decided upon the validity of the State government attempted to be established, in this State, by the members of the Constitutional Convention of 1861? If it has, then we are bound by our oaths and the Constitution of the United States, as construed by the Supreme Court, to recognize the action of Congress as final. By the provisions of an act of Congress, passed March 2, 1867, "To provide for the more efficient government of the rebel States," it is declared that "no legal State government" exists in the State of Arkansas. At the time of this declaration there was a kind of provisional government existing in this State, subject to and under the control of the military power of the United States government. The government that had been in existence, previous to the establishment of the provisional government, disappeared like the morning dew before the rays of a genial sun.

The mere introduction of federal troops, into the State of Ohio, Indiana or Illinois, made no change in the officers of the State government; nor did the Governors and Judges of those States flee at the approach of the emblem of American liberty. If the persons who exercised executive and judicial functions, within the State of Arkansas, were the officers of a *de facto* or *de jure* government they had nothing to fear from the United States forces. The mission of the United States troops, in the State of Arkansas, was to overthrow the political power of the State that had been organized into armies under the Constitution of 1861, and that of the Confederate States; this done and the labor of the army was at an end.

Officers could be found who said they belonged to the executive and judicial departments of the State of Arkansas, *under the Confederate States government;* but none were found who claimed to belong to the executive or judicial branches of the State of Arkansas, as it existed under the Constitution of the United States. We do not mean to be understood as saying

that Arkansas, territorially, ceased to be a State in the Union, but that the individuals who represented the political sovereignty of that State betrayed and deserted the high trust reposed in them, and, as a result of the betrayal, the sovereignty of the State ceased to be exercised, and, as a matter of course, vested in the people to be again called forth and exercised under such exactments as Congress, in its discretion, may have deemed prudent to "guarantee a republican form of government."

States have no existence, politically, outside of and independent of the Constitution of the United States. If a State exercises political power, it must be as a State of the Union; it cannot set up its independence, furnish men and means to destroy the national government, and when the retributive hand of justice seizes hold of her to bring it back, say, take my empty treasury, my despoiled fields and desolate homes, but respect the adjudications of my tribunals, and those acts of my government not in violation of the national Constitution. The litigants, in the courts of the State of Arkansas, had the right, in all questions involving a construction of the Constitution or laws of the United States, to go before the Supreme Court of the United States. The humblest citizen in the land had the right to sue and be sued in a court where the judge had taken an oath to support and defend the Constitution of the United States, and who would bow to its command. While it is true that the people of the State, create such courts, as to them shall seem meet, it is equally true that a citizen of the State is also a citizen of the United States, and, as such citizen, has a right to demand that that legal channel, to the Supreme Court of the United States, shall not be dammed with enactments on the statutes of his own State that forces him into the Confederate States Supreme Court. We are told in *Hawkins v. Filkins,* "that for the time being, no allegiance was due from the citizens of Arkansas to the United States; because the sovereign power of the United States was suspended

37

over the territory in the possession of the enemy, and was not obligatory upon the inhabitants who remained, because, where there is no protection or sovereignty, there could be no claim to obedience," and the case of the *United States v. Hayward (2 Gall. 485,)* is cited to sustain this doctrine. Now let us examine the Castine case. Castine, it appears, was a port of entry within and belonging to the United States, and was taken possession of by British troops, and so held, until after a treaty of peace between England and the United States. During the time Castine was so held by British troops, articles of merchandise were landed under such regulations as the British authorities chose to impose. After the treaty of peace had been signed, the United States took possession of the port of Castine. The authorities found, of course, a considerable quantity of merchandise that had been imported in violation of the revenue laws of the United States. An information was filed against one hundred and forty nine packages, for an alleged illegal importation, and a man, by the name of Hayward, claimed the goods and set up, in effect, that Castine was under the control of the British, by conquest, at the time of the importation, and, in point of fact, was not a port of entry of the United States in the sense used in the law. Judge STORY, in disposing of the case says: "By the conquest and occupation of Castine, that territory passed under the allegiance and sovereignty of the enemy  *  *  *  and the laws of the United States could no longer be rightfully enforced, or be obligatory on the inhabitants; that where there is no protection or sovereignty, there can be no claim to obedience." An attempt is made to show an analogy between the citizens of the State of Arkansas and the citizens of Massachusetts, by citing the language of Judge STORY, "that where there is no protection, there can be no claim to obedience." In our opinion, there is a vast difference between the citizens of Arkansas, during the rebellion, and the citizens of Castine during the time it was held by British troops. In the first place, England was a nation, and so recognized by the civilized

world; neither Arkansas or the Confederate States were. In the second place, a foreign foe compelled obedience to their mandates at the port of Castine; while in the State of Arkansas there was no enemy to the United States, save her own citizens, who attempted or were attempting, to resist the government of the United States. If it be conceded that the State of Arkansas or the Confederate States, was a government of the same dignity and character as the government of England, and that the conquering power owed no allegiance to the United States, then the conquered citizens, for the time being, would be excused from their allegiance to the United States. But this is not the fact; every man in the State of Arkansas, and every soldier in the Confederate army owed allegiance to the United States that could not be changed by simply donning a suit of gray. In our opinion, nothing but conquest and occupation, *by a foreign foe*, can ever, for one moment, excuse or suspend a citizen, of a State, from his allegiance to the United States.

The misconception that arose in the mind of the court, in the case of *Hawkins v. Filkins*, was, in assuming that the citizens of the United States could remain within its territory, and at the same time be alien enemies; and were further in error, by supposing that an unsuccessful revolution or rebellion ever reaches the dignity of being called a government. Successful rebellions found new governments; but the organizations, no matter by what name the rebellious party may call them, which may have been used by a defeated rebellious organization, fall with their cause, and are only evidence of what the government would *have been* if success had crowned their efforts. If, in 1861, the officers of the entire executive, legislative and judicial departments had resigned, rather than be parties to furnishing troops to suppress the rebellion, and other parties had seized upon the offices by virtue of a selection as such, at a mass meeting, and had administered the laws of Arkansas, as one of the States of the Union, the acts of the officers, so far as the rights of third persons are concerned,

would have been regarded as the work of an officer, *de facto*, and would have been supported on the ground that they were administering the laws of a rightful government. But in the case now before us, not only the government under which these proceedings were had was unlawful, but the officers, who were to execute its laws, had taken a solemn oath to support and sustain the unlawful government.

A *de facto* officer of an illegal and unlawful government is an anomoly that can only exist in absurdity. We have said that the government, put in operation under and by authority of the constitutional Convention of 1861, was not a government founded on the consent of the people. When the authority of the United States government was re-established within and over the territory composing the State of Arkansas, the people, for the first time, were allowed to express their approval or disapproval of the action of their servants who assembled at Little Rock on the 4th of March, 1861, and again on the 6th of May following, and instead of indorsing and approving the action of the Convention of 1861, they expressly repudiate and disclaim all fellowship therewith. They commenced the reorganization of their State government by declaring that "We, the people of the State of Arkansas, having the right to establish for ourselves a Constitution in conformity with the Constitution of the United States of America, recognizing the legitimate consequences of the existing rebellion, do hereby declare the entire action of the Convention of the State of Arkansas, which assembled in the city of Little Rock, on the 4th of March, 1861, was, and is null and void; and is not now and never has been binding and obligatory on the people." We are told in *Hawkins v. Filkins*, "If the Convention of 1864 had power to declare the Constitution of 1861, void, *ab initio*, most clearly that of 1861 had a like power to declare that of 1836 void." Here, again, the analogy sought to be drawn is not good. The Constitution and government, created by the Constitution of 1836, came into existence by and with the consent of the people; while the government created by the Constitu-

tion of 1861 never received the approval or assent of any portion of the people. If the constitutional Convention of 1861 had undertaken to have rendered invalid the entire action of the State of Arkansas under the Constitution of 1836, it would not only have exceeded its legitimate powers, but the power of the Federal government would have interposed and said: "Stay your hands; you are attempting to destroy and render nugatory the legal action of the lawful government of the State of Arkansas, one of the States of the United States." To say that the Convention of 1861 possessed the same powers as the Convention of 1864, or that of 1868, is to say that an illegal and unlawful body, (for they became such the moment they exceeded their powers), possesses the same inherent powers that belong to legal and lawful assemblages.

When the Conventions of 1864 and 1868 repudiated the action of the Convention of 1861, they in no manner interfered with the action or acts of a legal State government. While it may be claimed that the Convention of 1861 was legally assembled and for a lawful purpose, this fact furnishes no reason why its illegal acts should be placed on the same footing with the action of Conventions whose acts have received the sanction of the people and the approval of the Congress of the United States. There is no such thing as a *de facto* State known to the Constitution of the United States. The only States known to the Constitution of the United States are States *de jure;* and to be a State *de jure*, its relations with the Federal government must be in perfect harmony, and the government formed by the Constitution of 1861, for the State of Arkansas, was not such a State, in any sense of the word.

Judge CHASE, in *Thorington v. Smith*, (*8 Wall. 9*), speaks of a description of government as *de facto*, "the distinguishing characteristics of which are, that its existence is maintained by active military power within the territory, and against the authority of an established and lawful government;" and the case of Castine is referred to as an illustration of that class of government. We submit that the illustration is a very unhap-

py one, as the English government, while at Castine, was not laboring for the purpose of establishing any species of government within the territory of the United States. The sole ground upon which the citizens of Castine were, for the time-being, absolved from their allegiance to the United States, was, because the government of the United States was unable to protect its own citizens against the power of a *foreign foe*; but in this case, neither the army of a foreign foe, nor the army of any recognized government prevented the citizen from continuing his allegiance. Writers, on the law of nations and international law, speak of *de facto* governments; but the sense in which the word is used by them has not, and cannot have any application to the State. governments known to the Constitution of the United States. The different States of the Union, or rather the people of the different States of the Union, constitute one nation; they are an entirety; therefore we say that there can be no such thing as a *de facto* government of the United States and a *de jure* government of the United States existing at one and the same time, and such would be the result of any admission that characterizes the organization, known as the "Confederate States," as a government *de facto*. That it had *force*, no one will deny; and so have mobs; but force is not the criterion or standard by which right and wrong are measured.

Judge WALKER says: "All associations of people, when numerous, must, of necessity, have government; that civilized christian people are not, because of war, remitted back to a state of barbarism." As a general rule, the proposition is true; but when the rebellious districts are subdued, the law of the land, and not the law of the rebellion, is what every' citizen of the United States has a right to demand. The government formed by the Convention of 1861, was formed in aid of the rebellion; its judiciary was created for the purpose of adjudicating, not on the rights of citizens of the United States, but of the Confederate States. Here, then, was a court created for the purpose of adjudicating upon the rights of those

friendly to the rebellion, and which were closed as to the loyal citizens of the State and United States. If it be conceded that the people of Arkansas had a *right* to rebel, and destroy the State government of one of the States of the United States, then it follows that the courts, created in aid of the rebellion, are valid courts, and their adjudications entitled to respect; but not otherwise. VATTELL says: "whoever takes up arms without a *lawful* cause, can absolutely have *no right* whatever—that every act of hostility, he commits, is an act of injustice—that he is chargeable with all the evils; all the horrors of the war; all the effusion of blood; the desolation of families; the rapine; the acts of violence; the ravages; the conflagrations—that they are all his works and crimes." Whether Arkansas, or her people, had suffered such wrongs, neglects, and outrages, at the hands of the Federal government, as, in the eyes of civilized nations, gave her the *right* to cast off her allegiance, is not properly a judicial question, and will not be discussed here. If VATTELL's view is correct, it follows, naturally, that the authority of rebels to create courts depends entirely upon the fact whether the wrongs suffered were of such a character as could only be redressed by a resort to arms.

Judge PIKE, in the case of *The State v. Williams*, in speaking of the allegiance of the citizen says: "Where a free white male citizen, who has arrived at years of discretion, voluntarily takes the oath in question (the oath of allegiance) he cannot justify or excuse himself by any plea of duress; it is an overt act of treason; that the citizen cannot even claim imminent danger of immediate death as an excuse for his desertion of his country."

It is submitted, if the law is correctly laid down by Judge PIKE, that if "imminent danger" of immediate death is no excuse for the desertion of the Confederate cause, that the rule is, and was equally applicable to the citizen of Arkansas as a citizen of the United States. All writers agree that the allegiance of the citizen 'is due to his government. They all agree that when the citizen becomes a member of organized society,

he surrenders certain powers to what is called the government; that this surrender of power implies, and requires obedience to the government of his own creation. Allegiance is neither a privilege nor an immunity, it, on the contrary, is the duty the citizen owes to his government; and all writers and commentators agree that the citizen cannot be absolved from his allegiance through *his own* revolutionary acts. In a monarchial form of government, allegiance is due to the sovereign, be he prince, potentate or king. In a republican form of government, it is due, not to the person of the officers who, for the time being, are administering the government, but to the government itself.

The government, inaugurated under the provisions of the Constitution of 1864, was provisional, and the Congress of the United States never recognized it in any other light. It sprang into existence under the fostering care of the military arm of the government of the United States, and, but for its protection, the miasma of treason, then floating in the political atmosphere, would have sent it to an early grave instead of poisoning its life blood, as it afterwards did. In 1867, Congress, in looking over the States lately in rebellion, found the provisional governments in a languishing and dying condition. The miasma, arising from the debris of the rebellion, had slowly, but surely done its work. The legislative and judicial departments of the government were again filled by the same men, who, less than six years before, had been instrumental in destroying the political existence of the State, who, like so many upas trees, were exuding into the atmosphere, around the executive, a poison that was fast paralyzing all his efforts to make a loyal State of Arkansas. When Congress beheld this state of affairs, under that clause of the Constitution requiring the United States to guarantee to each State a republican form of government, it commenced the work of reconstruction.

Under the provisions of the acts thus passed, with the presence of United States troops as a disinfectant, the body poli-

tic once more began to breathe with some show of vitality.
Once more a Constitutional Convention assembled and framed
an organic law for the State; it was submitted to the qualified
electors and ratified; and we, to-day, derive our sole power
to sit here by reason of that instrument. Another pro-
vision of that Constitution declares: "That all the action of
the State of Arkansas, under the authority of the Convention
which assembled at Little Rock, on the 4th day of March, 1861,
of its ordinances, or its Constitution, whether legislative, exec-
utive, *judicial* or military, was, and is, hereby declared null and
void." We are now asked whether this court will regard the
service made in 1861, by a Confederate court, as good? If
this court was the legal successor of the courts organized under
the Constitution of 1861, we would feel inclined to uphold the
action of the inferior court, if its action was regular in other
respects, but it is not. This court is a lineal descendant of the
legal and lawful State government that was in existence under
the provisions of the Constitution of 1836. The Constitution
of 1868, and that of 1836, sprang from the same sovereignty,
while the Constitution of 1861 simply sprang into being
through usurpation and treachery of men who betrayed the
trust reposed in them by their constituents. The courts, that
existed under the Constitutions of 1836 and 1868, were created
by the people; the courts, existing under the Constitution of
1861, were the creatures of the individuals who composed the
Convention; the former from the sovereignty, and the latter
from usurpation and violence.

These things being true, we do not conceive that Littleton
Penn was bound to appear in the Crittenden court, even if the
service had been that prescribed by the statute in force prior
to March 4, 1861. It may be conceded that the court, which
rendered the final decree, was a valid court; but if no valid
service had been obtained before the rendition of the decree,
its decree is a nullity. There are some irregularities urged
against the original decree. We will remark that the original
decree is not properly before this court. The case comes here

on the record of the proceedings had on the supplemental bill. If counsel desire to avail themselves of the irregularities alluded to, it must be done in a direct proceeding for that purpose.

The decree of the court below is reversed, and the cause remanded.

Harrison, J. dissenting.